**Ruth MacEACHERN, et al., Plaintiffs,**

v.

**CITY OF MANHATTAN BEACH, Manhattan Beach Police Department, Kristopher Thompson and Does 1 to 100, Defendants.**

**Case No. SACV 08–0523 DOC (RNBx).**

United States District Court,
C.D. California.

June 8, 2009.

Brian Charles Carlin, David W.T. Brown, Paul E. Heidenreich, Huskinson Brown Heidenreich Amd Carlin LLP, Manhattan Beach, CA, for Plaintiffs.

Nathan A. Oyster, Lawrence Beach Allen and Choi, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DAVID O. CARTER, District Judge.

Before the Court is Defendants City of Manhattan Beach ("City"), Manhattan Beach Police Department ("MBPD"), and Officer Kristopher Thompson's ("Thomp-

son") Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 (the "Motion"). After considering the moving, opposing, and replying papers, as well as the parties' oral argument, the Court hereby GRANTS the Motion.

## I. BACKGROUND

The Court presents the parties' version of the facts separately in order to highlight any disputes.

### a. Defendants' Version of the Facts

At approximately 7:15 p.m. on May 10, 2007, Manhattan Beach Police Officer Kristopher Thompson received a radio call informing him that a man had just threatened a woman with a knife at the Chevron Gas Station in Manhattan Beach near the intersection of Rosecrans and Sepulveda. Officer Thompson is a K–9 officer, and on that day, his canine partner was a male Dutch Shepard named Kraft. After hearing the call, Officer Thompson spoke to the dispatcher to clarify that the woman had actually seen a knife. The dispatcher confirmed that the woman had seen the suspect with a knife. The dispatcher also gave Thompson a physical description of the suspect, including that the man was carrying a dark backpack.

Due to Officer Thompson's close proximity to the scene, he arrived at the intersection of Rosecrans and Sepulveda within 15 seconds. He saw a man fitting the suspect's description, decedent Andrew MacEachern ("MacEachern"), walking northbound across Rosecrans Avenue. Thompson contends that he saw a dark backpack in MacEachern's left hand but could not see MacEachern's right hand. Due to the match in description, Thompson decided to initiate a stop of MacEachern. Thompson had to drive his vehicle over the concrete median that separated eastbound and westbound traffic on Rosecrans Avenue. Thompson then stopped his car in a northeast direction across the westbound lanes of Rosecrans. He contends that MacEachern was on the northwest sidewalk slightly west of Sepulveda at that time.

Officer Thompson then exited his car and MacEachern turned to face him. The parties were approximately 25 feet apart. Officer Thompson contends that when MacEachern turned towards him, Thompson saw that MacEachern held a knife with a silver blade in his right hand. Upon seeing the knife, Officer Thompson raised his gun and ordered MacEachern to drop the knife and get on the ground. Thompson avers that MacEachern ignored him and then made a few steps towards Thompson. MacEachern then allegedly raised his left hand "in an extended position, perpendicular to his body, exposing his open left palm as if the guard hand would protect the suspect from a blow by an assailant." Defs.'s Mot. at 4–5. He then jabbed the knife at Officer Thompson. Officer Thompson contends that he repeatedly ordered MacEachern to drop the knife and get on the ground. He avers that he made such requests at least ten times.

Thompson contends that as he continued to order MacEachern to drop the knife, MacEachern took a few more steps towards Thompson and continued walking closer. Fearing for his life, Officer Thompson then fired three rounds from his pistol at MacEachern. At the time Officer Thompson shot his gun, MacEachern was approximately ten feet away from Thompson. Thompson immediately made a call of "shots fired." The entire interaction with MacEachern was no longer than 67 seconds. MacEachern died from the shooting. Officer Thompson's police dog remained in the police vehicle during the entire interaction.

Officer Thompson contends that he fully cooperated with the investigation into the

shooting by the Los Angeles County Sheriff's Department. On May 1, 2008, he received the 2008 South Bay Medal of Valor for his actions during the May 10, 2007 incident.

### b. Plaintiff's Disputed Facts

Plaintiff does not dispute any facts leading up to Officer Thompson arriving at the scene. However, Plaintiff points out that Defendant Thompson indicates he responded Code 3 to the dispatch. By responding Code 3, an officer's video camera on his or her patrol car is supposed to immediately activate. Yet, Officer Thompson's camera appears to have malfunctioned, so no recording of the incident was made.

Second, Plaintiff points out that two witnesses, April Marano–Ford and John Ford, who were in their car at the scene, saw decedent MacEachern cross the street. They both claim that they did not see MacEachern with a knife but instead thought he may have had a piece of paper in his right hand. They also indicate that they did not feel MacEachern was acting in an aggressive manner. However, they both admit that once MacEachern began interacting with Defendant Thompson, MacEachern's back was to them so they could no longer see his hands. While acknowledging that during the quick interaction between MacEachern and Thompson, the Fords saw the two men get closer to each other, the Fords do not make clear exactly which man moved closer to the other person and can only estimate the distance between the two men at the time of the shooting. Further, while the Fords could not hear any communications between Thompson and MacEachern, Ms. Marano–Ford acknowledges that she could tell Thompson was yelling at MacEachern.

In addition, Plaintiff provides the deposition testimony of a third witness, Paula Parker. Ms. Parker also indicates that she did not see MacEachern with a knife but states that, just like the Fords, she could not see MacEachern's hands at the time he was interacting with Officer Thompson. Further, she contends that she saw MacEachern raise his hand prior to Thompson shooting MacEachern and that she felt threatened. *See* Parker Dep. at 74:24–75:3 ("What I can say is that prior to the actions of the gentleman on the corner made me feel threatened enough where I would certainly see how the officer who was there at the same point in time would feel threatened as well.").

Plaintiff also points out that decedent MacEachern is alleged to have been holding the knife in his right hand even though he was left-handed. In response to photographic evidence presented by Defendants showing a knife next to MacEachern after the shooting, Plaintiff also directs the Court to fingerprint testing that was conducted on the knife that did not pick up any latent fingerprints on the knife. Though these facts are not disputed, Plaintiff also emphasizes that Thompson was wearing a bulletproof vest and had a button on his belt that could have opened the door of his police vehicle, releasing his dog. Further, other officers were on their way to the scene. It is also undisputed that MacEachern, a white male in his mid-fifties, was homeless.

## II. LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v.*

*Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1161 (9th Cir.1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *see also Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. Furthermore, a party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir.1982). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

Plaintiff brings suit under 42 U.S.C. § 1983. 42 U.S.C. § 1983 provides a claim for deprivations of federal constitutional or statutory rights under the color of law. *See* 42 U.S.C. § 1983 ("Every person who, under color of any [law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.")

### A. Preliminary Stipulations and Contentions

As a preliminary matter, Plaintiff stipulates to the dismissal of all Sixth Amendment claims against Defendants. Plaintiff also stipulates to dismiss all claims against the MBPD, and agrees that she cannot pursue punitive damages against the City.

In addition, Plaintiff alleges that decedent was subject to "cruel and unusual punishment" (*see, e.g.,* Compl. at ¶ 13), implying a claim under the Eighth Amendment. However, as Defendants point out, the Eighth Amendment does not govern claims relating to officer conduct prior to the claimant's criminal conviction. *Bell v. Wolfish,* 441 U.S. 520, 535–537, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law"). Plaintiff does not counter Defendants' argument or otherwise address the Eighth Amendment in her briefing. Thus, any claims related to the Eighth Amendment are dismissed from this action.

Also, Defendants rightly note that while the Complaint refers to the Americans with Disabilities Act ("ADA") as a basis for the Section 1983 claim, the Complaint fails to present any facts that MacEachern was disabled pursuant to the ADA. Any addi-

tional facts suggesting that an ADA claim is implicated by the encounter between MacEachern and Thompson are absent from the briefing. Plaintiff fails to oppose Defendants' argument that the ADA cannot form a basis for relief. Thus, any allegation as to the ADA is also dismissed. The Court also notes that in paragraph 14 of the Complaint, Plaintiff alleges that decedent MacEachern was deprived of his rights under the Privileges and Immunities Clause of the U.S. Constitution, Article IV, Section 2, Clause 1, providing that "[t]he citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." While Defendants contend that they are moving for summary judgment as to all claims, they do not directly address Plaintiff's request for relief pursuant to the Privileges and Immunities Clause. However, the Court finds that the claim, as alleged in the Complaint, is completely without merit. There is no factual allegation that MacEachern was discriminated against as a nonresident. Thus, any allegations related to the Privileges and Immunities Clause are dismissed. Finally, there is no allegation in the Complaint that MacEachern is a member of a protected class for purposes of the Equal Protection Clause. Thus, any claims for a violation of equal protection are also dismissed.

## B. Discovery Concerns

Defendants also argue that certain matters have been deemed admitted pursuant to relevant discovery rules and case law, allowing for this Court to enter summary judgment in favor of Defendants. Defendants point out that Plaintiff failed to respond to a set of Requests for Admissions until more than two months after the responses were due. Under Fed.R.Civ.P. 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves a written answer or objection . . . ." Further, "[t]he failure to respond to admissions can effectively deprive a party of the opportunity to contest the merits of the case." *In re Carney,* 258 F.3d 415, 421 (5th Cir. 2001). In addition, the Central District has treated Rule 36 as self-executing and used such admissions in support of a summary judgment motion. *Cook v. Allstate Ins. Co.,* 337 F.Supp.2d 1206, 1209–11 (C.D.Cal.2004). In that case, the plaintiffs filed responses to requests for admissions over two months late. The court found the plaintiffs' explanation for the tardiness inadequate and as a result considered the matters for purposes of the defendant insurer's summary judgment motion. *Id.*

Here, too, Plaintiff provides an entirely unconvincing explanation for responding to the admissions in such a tardy fashion. Her counsel was granted an extension to respond to the admissions. However, despite that extension, he still filed them late. He contends that he decided to wait on responding to the admissions even after receiving the initial extension because he was working with Defendants in dismissing many of the initial plaintiffs (decedent MacEachern's siblings, etc.) from the action and avers that a dismissal of many of these plaintiffs made the requested discovery moot. However, this allegation is without merit. The matters that Defendants argue are admitted are relevant regardless of the dismissal of certain plaintiffs. Indeed, the admissions speak to the very core of Plaintiff's case (such as whether MacEachern threatened Officer Thompson and whether Officer Thompson violated MacEachern's Fourth Amendment rights). Plaintiff's counsel seems to imply that it was too demanding to both seek a dismissal of certain plaintiffs and respond to discovery. But such an argument cannot suffice as a legitimate excuse for his lack of diligence (the Court notes that Plaintiff's counsel raised a similar argument in response to the untimely filing of his opposition to the instant motion).

Plaintiff appears to request that this Court withdraw or amend these admissions pursuant to Fed.R.Civ.P. 36(b), though she makes no formal motion to that effect. Further, her opposition does not clearly show that she meets the requirements for withdrawal or amendment under Rule 36(b). *See Sonoda v. Cabrera,* 255 F.3d 1035, 1038 (9th Cir.2001) (withdrawal or amendment appropriate where presentation of the merits of the action will be served and the party who obtained the admissions will not be prejudiced). Indeed, the Court cannot understand why the Plaintiff, at the time of serving late responses, would not have sought a stipulation to withdraw or amend her admissions or properly brought such a motion at that time, instead of waiting until Defendants filed a summary judgment motion to finally raise the issue.

However, the Court need not even resolve this issue. As detailed below, the Court finds that the Plaintiff has not demonstrated the existence of material fact issues warranting a jury trial even without considering the deemed admissions. The Court primarily highlights this situation as a further instance of Plaintiff's failure to diligently prosecute this matter.

### C. Fourteenth Amendment

■ While excessive force claims are typically analyzed under the Fourth Amendment, the relevant standard changes when an heir of a decedent asserts a Section 1983 claim without alleging that she brings the suit in a representative capacity. In those circumstances, the Fourteenth Amendment applies. As Plaintiff properly notes, substantive due process protects the parent-child relationship. "The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child...." *Curnow v.*

*Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991).

As the Supreme Court made clear in *Lewis,* only official conduct that "shocks the conscience" violates substantive due process under the Fourteenth Amendment. *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citing *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). The Ninth Circuit treats the "shocks the conscience" test as one involving a spectrum between "a purpose to harm" standard and a "deliberate indifference" standard. *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir.2008).

■ Where an officer faces "fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply." *Id.* at 1139. Such circumstances require officers to make "repeated split-second decisions about how best to apprehend [a] fleeing suspect in a manner that will minimize risk to their own safety and the safety of the general public." *Bingue v. Prunchak,* 512 F.3d 1169, 1176 (9th Cir.2008). Thus, the Ninth Circuit has held that high-speed car chases always require an application of the "purpose to harm" standard. *See Id.* at 1175–77.

At the other end of the spectrum is the "deliberate indifference" standard. As noted in *Lewis,* this standard has been applied in Eighth Amendment prison cases related to normal custody scenarios (rather than in the exigency of prison riots requiring an application of the "purpose to harm" standard) in which "prison officials [ ] hav[e] time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lew-*

is, 523 U.S. at 853, 118 S.Ct. 1708. This standard requires a meaningful opportunity for actual deliberation. *Porter,* 546 F.3d at 1138.

While Defendants argue that the more stringent "purpose to harm" standard applies to the facts of this case, Plaintiff contends that this Court should utilize the "deliberate indifference" standard, as Defendant Thompson admits to having 20 to 25 seconds to decide whether to shoot decedent MacEachern. However, Plaintiff's understanding of the "deliberate indifference" standard is misinformed, and the Court holds that the "purpose to harm" standard applies to the facts of this case. Indeed, looking at the facts of *Porter* and the arguments addressed by the Ninth Circuit demonstrate the error of Plaintiff's analysis.

In that case, the entire confrontation between the defendant officer and the decedent took approximately five minutes. *Porter,* 546 F.3d at 1139. Further, the officer was on the scene, not in the context of a high-speed chase, but in order to investigate a suspicious vehicle parked at the side of the road in which the decedent was located. *Id.* at 1133–34. Further, when the decedent began driving his car away from the scene, the officer had already pepper-sprayed the decedent, and the decedent was driving at a slow speed and likely did not pose a serious threat to any of the officers present. *Id.* at 1335. The officer at the scene also at no point reported seeing the decedent with a gun, and no weapon was recovered from the car. *Id.* Faced with these facts, the Ninth Circuit overturned the district court's application of the "deliberate indifference" standard and held that the situation was more akin to an emergency requiring an application of the "purpose to harm" standard. *Id.* at 1139. The Ninth Circuit rejected the district court's conclusion that the defendant officer had a meaningful

opportunity to "consider what he was doing before he acted" because the incident occurred across five minutes, and thus the deliberate indifference standard should apply. Instead, the Ninth Circuit reasoned that "'deliberation' for purposes of the shocks the conscience test is not so literal a concept, [noting that] the Supreme Court rejected the deliberate indifference standard for high speed chases, even though logically an officer giving chase could deliberate even while accelerating after a suspect." *Id.* at 1139–40. Instead, the court found the events were "in constant flux" and rapidly evolving, requiring an application of the "purpose to harm" standard. *Id.* at 1140.

Faced with this precedent, the Court cannot adopt Plaintiff's position that an incident that spanned 67 seconds involved enough time for the Court to apply the deliberate indifference standard. The instant scenario, in which it is undisputed that Officer Thompson was called to the scene to respond to an alleged assault with a deadly weapon, is as volatile as the facts presented in *Porter,* if not more. Instead, Plaintiff appears to improperly subscribe to an overly technical, and literal interpretation of the "deliberate indifference" standard, an interpretation that has been rejected by the Ninth Circuit. Thus, the Court proceeds to address whether Officer Thompson's conduct "shocks the conscience" pursuant to the "purpose to harm" standard.

Under the "purpose to harm" standard, there is no substantive due process violation unless the Plaintiff shows that Officer Thompson's purpose in shooting MacEachern was "to cause harm unrelated to the legitimate object of arrest." *Lewis,* 523 U.S. at 836, 118 S.Ct. 1708.

Because Plaintiff argues that the "deliberate indifference" standard applies, she presents no arguments that Defendant

Thompson's conduct violated the "purpose to harm" standard. Further, Officer Thompson provides uncontroverted testimony that he was on the scene in response to a call that a man, fitting MacEachern's description, had threatened a woman with a knife, a felony under California law. In addition, California Penal Code § 836(a)(3) allows an officer to effectuate an arrest when "[t]he officer has probable cause to believe that the person has committed a felony, whether or not a felony, in fact, has been committed." There is no dispute that Defendant Thompson had probable cause, based on the dispatch he received, to believe that MacEachern was the subject in question. Thus, there seems to be little argument that Defendant Thompson had a purpose to harm MacEachern unrelated to his legitimate objective to arrest MacEachern for assault with a deadly weapon. As more fully and thoroughly laid out in the Fourth Amendment section, Plaintiff also does not demonstrate that there are triable issues of fact warranting this case to proceed to a jury.

### D. Fourth Amendment

■■■ "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). However, "the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 369 (9th Cir.1998) (citing 42 U.S.C. § 1988(a); *Smith v. City of Fontana*, 818 F.2d 1411, 1416–14 (9th Cir.1987)). "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival

action and that the plaintiff meets that state's requirements for bringing a survival action." *Id.*

■ Defendants do not dispute that California law allows for survival actions. *See* Cal.Code Civ. Proc. § 377.30 ("A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest ... and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."). However, Defendants point out that Plaintiff has yet to fulfill the necessary requirements in order to proceed as decedent's successor-in-interest. They direct the Court to Cal. Code of Civ. Proc. § 377.32, requiring the plaintiff to, among other things, file an affidavit or declaration indicating that she is authorized to act as the decedent's successor-in-interest.

As of yet, Plaintiff has failed to allege in the Complaint that she is bringing suit in her representative capacity[1] and has also failed to introduce evidence that she is in fact the successor-in-interest of decedent MacEachern under California law. Plaintiff provides no explanation for her failure to properly plead the Fourth Amendment claim in a representative capacity or for her failure to comply with the requirements of California law as to survival actions, especially as this suit was filed on May 9, 2008, over one year ago. At most, Plaintiff now contends in her opposition that she is in the process of complying with the applicable California law.

■ However, Defendants' respond that the statute of limitations has run for MacEachern's Fourth Amendment claim. Because Section 1983 has no specific statute

1. See Compl. at ¶ 1 ("This is a wrongful death action by the family and heirs of ANDREW MACEACHERN based upon the defendants' actions in the deprivation of decedent's constitutional rights under color of state law.").

of limitations, federal courts borrow state statute of limitations for personal injury actions. *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1048 (9th Cir.2008) (borrowing California's statute of limitations for personal injury actions in Section 1983 suits). While state law determines the length of the statute of limitations, "[f]ederal law determines when a cause of action accrues and the statute of limitations begins to run for a § 1983 claim. A federal claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir.1991) (citations and internal quotation marks omitted). Under California law, personal injury actions have a two-year statute of limitations. *See* Cal. Code of Civ. Proc. § 335.1 ("Within two years: An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another."). Here, the Section 1983 cause of action for a violation of the Fourth Amendment clearly accrued on May 10, 2007, at decedent MacEachern's time of death. It has been two years since the accrual of that cause of action, and under California law, survival actions do not relate back to timely wrongful death actions. *See Quiroz v. Seventh Ave. Center*, 140 Cal.App.4th 1256, 1279, 45 Cal.Rptr.3d 222 (2006). As a result, it appears that Plaintiff's survival action is time-barred as well.

■ Thus, because Plaintiff has not shown that she meets the requirements of California law for bringing a survival action, she cannot proceed on her Fourth Amendment claim. However, even if she did meet such requirements to bring a survival action, the Court finds that the facts presented demonstrate that Officer Thompson did not violate the Fourth Amendment.

■ "A police officer may reasonably use deadly force where he 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir.2002) (*quoting Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). "[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694. *See, e.g. Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir.2005) (recognizing that "where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force."); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) *overruled on other grounds in Acri v. Varian Associates, Inc.*, 114 F.3d 999 (9th Cir.1997) (holding deadly force reasonable where suspect, who was behaving erratically, swung a knife at an officer).

■ Further, "that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself," even deadly force. *Billington*, 292 F.3d at 1190. Only if the officer has engaged in an independent violation of the Fourth Amendment that ultimately results in a need to use deadly force, will that force, though reasonable at the time of use, still subject the officer to liability. *Id.* at 1189 (limiting *Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir.1994), to hold "that where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation [in *Alexander*, an unjustified warrantless entry into the suspect's home], he may be held liable for his otherwise defensive use of deadly

force"). Finally, "[t]he Fourth Amendment does not require law enforcement officers to exhaust every alternative before using justifiable deadly force." *Forrett v. Richardson,* 112 F.3d 416, 420 (9th Cir. 1997) *overruled on other grounds by Chroma Lighting v. GTE Prods. Corp.,* 127 F.3d 1136 (9th Cir.1997).

■■■■ Even if an officer uses excessive force in violation of the Fourth Amendment, the officer is entitled to qualified immunity from suit under Section 1983 where an objectively reasonable officer would not have known that the conduct was unconstitutional under the circumstances. *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004). The Supreme Court has set forth a two-part analysis for considering the issue of qualified immunity. First, a district court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If this threshold question is answered affirmatively, then the court must ask "whether the right was clearly established." *Id.* A right is "clearly established" if, "in light of the specific context of the case," it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02, 121 S.Ct. 2151. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202, 121 S.Ct. 2151.

The Supreme Court has recently receded from *Saucier v. Katz* by indicating that even though the sequence of the two-pronged analysis, as articulated above, is often appropriate, a court no longer need regard it as mandatory. *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Instead, district court judges are now afforded discretion based on the facts and circumstances of the cases before them to decide which prong to address first. *Id.*

Based on the facts presented in this matter, the only reasonable conclusion that can be drawn from the evidence is that Defendant Thompson did not violate Mac-Eachern's Fourth Amendment rights. Officer Thompson was on the scene in response to a call that an assault with a deadly weapon had occurred. MacEachern matched the description of the suspect. Officer Thompson contends that MacEachern threatened Thompson with a knife and failed to drop the knife and drop to the ground, an assertion that is not directly countered by any of Plaintiff's evidence. Further, while Defendant Thompson may have had less deadly force available to him (i.e. his police dog), his failure to use such force does not rise to the level of a Fourth Amendment violation where he was confronted with an armed suspect and required to make a quick decision regarding how to react. For the same reasons, his decision not to wait for backup also cannot be second-guessed here. Defendants decision to use deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In addition, that he was wearing a bulletproof vest does not alter the fact that he was confronted with an armed suspect. The inquiry into unreasonable force requires the court to evaluate the facts and circumstances of the case and "must embody allowance for the fact that police officers

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–7, 109 S.Ct. 1865. Based on this standard, Officer Thompson did not violate the Fourth Amendment as a matter of law.

Despite Plaintiff's arguments to the contrary, Plaintiff's evidence does not create any genuine issues of material fact. Indeed, Plaintiff provides no affirmative evidence that MacEachern did not threaten Thompson with a knife. While two of the witnesses Plaintiff utilizes claim that they did not see a knife in MacEachern's hand prior to his confrontation with Thompson, they also admit that they could not see MacEachern's hands at the time of the confrontation. In addition, the testimony of the third witness relied on by Plaintiff actually supports Thompson. That witness, Paula Parker, indicates that even though she could not see MacEachern's hand, she saw him raise his arms towards Officer Thompson, and she too felt threatened by MacEachern. Those witnesses also do not clearly dispute the distance between Thompson and MacEachern at the time of the shooting, and to the extent they do, such a dispute would not amount to a jury issue. *See Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1261–62 (10th Cir.2008) (holding that officer did not violate Fourth Amendment as a matter of law when he shot knife-wielding suspect who might have been anywhere between seven to twenty feet from the officer at the time of the shooting). Further, Plaintiff provides no evidence that MacEachern was not the man who originally threatened a woman with a knife, that a woman was not actually threatened with a knife in the first instance, or that MacEachern did not fit the suspect's description. Thus, Plaintiff does not undermine Thompson's position that he had probable cause to arrest MacEachern. At

most, Plaintiff raises a question of whether Thompson was negligent in ultimately using deadly force, due to his failure to utilize his police dog or wait for back-up. However, as stated above, negligence alone will not suffice to show a violation of the Fourth Amendment.

In addition, Plaintiff's evidence regarding the knife also does not create a jury issue. Besides arguing that no third parties saw the knife (even though all third-party witnesses admit that they could not see MacEachern's hands), Plaintiff points out that MacEachern was left-handed and the knife was alleged to be in his right hand. However, an allegation that MacEachern would not have held the knife in his non-dominant left hand is insufficient to overcome summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (opponent to summary judgment motion must do more than raise some "metaphysical doubt as to material facts"). Further, the failure to identify latent fingerprints on the knife does not create a jury issue regarding whether MacEachern possessed the knife. Indeed, Defendants present colored photos showing the knife next to MacEachern after the shooting. Plaintiff has not shown how the lack of prints demonstrates that MacEachern did not in fact have the knife on his person and has not otherwise refuted the photographic evidence.

Thus, the Court finds as a matter of law Officer Thompson did not violate the Fourth Amendment. Further even if Officer Thompson used excessive force here, he nonetheless is entitled to qualified immunity as a matter of law. Qualified immunity is more than a mere defense to liability; it is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411

(1985). As previously discussed, the doctrine acknowledges that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151. Accordingly, qualified immunity shields from suit "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Here, when confronting a suspect who matched the description of a man who had allegedly threatened a woman with a deadly weapon and would not comply with the officer's requests to drop to the ground, a reasonable officer would have thought the use of deadly force acceptable, even if the officer could not clearly see a weapon. *See Dague v. Dumesic,* 286 Fed.Appx. 395, 396 (9th Cir.2008) (reversing district court's denial of qualified immunity where officers shot suspect [after tasing him] who kept his left hand concealed during the standoff, made a statement that he could make the cops do what he could not, and had previously told 911 operator that it would be "easy enough" to provoke cops to shoot him).

Thus, summary judgment is granted in favor of Defendants as to Plaintiff's Fourth Amendment claims.

### E. Under Color of State Law

■ The Court notes that in proceeding against Officer Thompson, Plaintiff raises as an alternative argument that Thompson was not in fact acting under color of state law. *See* Compl. at 21 ("It is further alleged herein, in the alternative, that the acts of defendant [Thompson] were outside and beyond his legal authority as a law enforcement officer and therefore, that his conduct in the denial of the civil rights of [MacEachern], while allegedly performed under color of law, were actually individual acts that were not authorized by law."). Considering Plaintiff only purports to bring a single cause of

action under Section 1983, the Court finds this alternative argument rather perplexing.

However, more significantly, an argument that Thompson was not acting under color of state law is without merit and completely unsupported by the facts. A defendant has acted under color of state law when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). There is no dispute that defendant Thompson was on the scene as an on-duty police officer responding to a dispatch that an assault with a deadly weapon had occurred. Thus, when he engaged in a confrontation with MacEachern leading to MacEachern's death, he was clearly functioning as a state actor. Plaintiff presents no facts suggesting otherwise. Thus, the allegations in paragraph 21 of the Complaint are also dismissed.

### F. *Monell* Liability

■ A government entity cannot be found liable under 42 U.S.C. § 1983 for merely employing a tortfeasor. *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, it will be liable for constitutional violations that, "implement[ ] or execute[ ] a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018. In other words, a municipality is liable for acts arising from an "official policy or custom." *Id.* at 691, 98 S.Ct. 2018; *see also Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443 (9th Cir.1989). "Customs" or "usages" are covered by § 1983 because they "could well be so permanent and well

settled as to constitute a 'custom or usage' with the force of law." *Id.* citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Establishing an official custom requires more than proof of the single incident of which the plaintiff complains. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Otherwise *Monell*'s limitation of municipal liability would be a dead letter. "Consistent with the commonly understood meaning of custom, proof of random acts or isolated events are insufficient to establish a custom." *See Thompson,* 885 F.2d at 1443–44 citing *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987); *Depew v. City of St. Mary's,* 787 F.2d 1496, 1499 (11th Cir.1986). Indeed, to prove a custom, the Plaintiff must present evidence, "that his injury resulted from a 'permanent and well-settled' practice. . . ." *Id.*; *see also Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996) (Plaintiff must prove a "longstanding practice or custom which constitutes standard operating procedure of the local government entity") (quoting *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir.1992)); *see e.g. Sloman v. Tadlock,* 21 F.3d 1462, 1470 (9th Cir.1994) (finding no custom based on continued conduct by one officer); *Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991) (no custom or policy based on single isolated incident). In determining whether the Plaintiff has produced sufficient evidence to establish a custom, the Court must remain cognizant of the widespread and distressing policies

that gave shape to § 1983[2] as well as the risk of improperly imposing vicarious liability on defendants based on isolated incidents of misconduct.

■■■ Defendants argue that Plaintiff's claim against the City fails for a number of reasons. First, Defendants argue that there is no underlying constitutional violation by Thompson, so the City cannot be liable either even if it employs unconstitutional policies. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the department regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (emphasis in original)).

In addition, Defendants argue that Plaintiff has not shown that an unconstitutional policy in fact caused the constitutional deprivation at issue. Defendants further contend that all policies and regulations of the City and the MBPD regarding the use of force are constitutionally sufficient.

In response, Plaintiff argues, based on the deposition testimony of Sergeant Tobias and Defendant Thompson, that the City has an unconstitutional policy of teaching officers to use force based not on objective standards but on the officers' own subjective fears. *See* Pl.'s Opp. at 16. Plaintiff also claims that the City tells officers to consider the safety of their police dogs more than the safety of the suspects pur-

---

2. As the Supreme Court noted in *Adickes v. S.H. Kress & Co.,*

> Congress included customs and usages within its definition of law in § 1983 because of the persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South. As Representative Garifield said: '(E)ven where the laws are just and equal on their face, yet, by a systematic maladministration

> of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them.' Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law. 398 U.S. at 167–68, 90 S.Ct. 1598 (citations omitted).

sued by the officers. However, reviewing the deposition testimony cited by Plaintiff does not make the requisite showing of any such a policy, custom, or practice.

For example, the Court infers that Plaintiff meant to refer the Court to Sergeant Tobias' deposition testimony at pages 124–125 (though Plaintiff's citations to the record are frequently inaccurate). In response to Plaintiff's question regarding how officers are trained as to the meaning of "immediate threat of death or serious bodily injury" regarding the MBPD's policy for the use of deadly force, Tobias states the following: "Well, specifically—and what we know in law enforcement is that—that wording itself goes to the officer's state of mind. And what I perceive to be a threat may be different than what somebody else perceives to be a threat and conversely what others believe to be a threat. So it's—you know, to define what that means is up to somebody's state of mind. It's individual circumstances." Tobias Dep. at 124:21–125:5. Thus, Plaintiff seems to imply that inadequate training regarding the proper, constitutionally appropriate meaning of "immediate threat of death or serious bodily injury" led to the shooting of decedent MacEachern.

As to the inadequacy of training, the Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In other words, the specific inadequacies of the training program must be so obvious that they constitute a conscious choice on the part of policymaking officials to disregard constitutional rights. *Id.* at 389–91, 109 S.Ct. 1197. Further, "[t]hat a particular officer may be unsatisfactorily

trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.... Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.* at 391, 109 S.Ct. 1197.

Further, while the Court is required to view the evidence in the light most favorable to Plaintiff, it must draw only reasonable inferences from that evidence. *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 680 (9th Cir.1985). Looking at the limited deposition testimony of Tobias, the Court cannot see how Plaintiff has made a requisite showing of an unconstitutional or inadequate training program. Tobia's deposition testimony does not suggest that officers are told to only consider their subjective fears, as Plaintiff would have this Court believe. Instead, the deposition testimony reflects that officers are told to evaluate the circumstances in which they find themselves and recognizes that some officers will respond differently to a given situation. In addition, this limited evidence, constituting a few answers in the deposition of a single sergeant, cannot form the basis for an argument that there is a widespread inadequacy in training. The Court finds that a reasonable jury could not properly infer, based solely on this limited deposition testimony, that the City has a custom of allowing the improper use of deadly force in effectuating arrests.

In addition, Plaintiff's allegation that the City has an unconstitutional policy of valu-

ing the lives of police dogs over the lives of suspects is completely unsupported in the record. Indeed, Defendant Thompson's deposition testimony contradicts this argument as Defendant Thompson acknowledges that the MBPD's policies allow for the use of police dogs when a suspect poses a risk of immediate violence to the public or an officer. Thompson Dep. at 162:1–6. Further, the deposition testimony of Sergeant Bryan Klatt, provided by Plaintiff in support of her opposition, indicates that in fact human life is considered above that of the police dog's life, but that officers also must consider whether the police dog will help aid the officer with the situation in which he or she finds himself. Klatt Dep. at 79:18–80:2. Thus, the evidence presented actually contradicts Plaintiff's assertions. On the evidence presented, a reasonable jury could not find that an unconstitutional policy led to the death of decedent MacEachern.

Also, to the extent Plaintiff's Complaint attempts to pin liability on the City based on a theory of ratification (Compl. at ¶ 12), this allegation, too, is without merit. First, the Court notes that Plaintiff does not directly oppose Defendants' argument that ratification cannot form a basis for municipal liability based on the facts of this case. In addition, case law supports the Defendants' position. For example, the Ninth Circuit was presented with a similar situation in *Haugen v. Brosseau*, 351 F.3d 372 (9th Cir.2003). In that case, the plaintiff argued that the city and police department should be liable for the officer's use of deadly force based on a theory of ratification (the officer shot but did not kill the plaintiff), as after the shooting the city and police department allegedly failed to discipline the officer, thereby "ratifying" the officer's conduct. *Id.* at 393. However, the Ninth Circuit found that the single instance of failure to discipline did not rise to the level of ratification for purposes of imposing *Monell* liability. *Id.* Here too, Plaintiff has at most presented a single instance of failure to discipline. Therefore, the City is entitled to summary judgment.

### G. Conspiracy

Plaintiff alleges that Defendants conspired (1) "to perform the acts that violated the civil rights of [decedent MacEachern]" and (2) to "cover-up the wrongful conduct of defendant Thompson ... [that led to] the denial of those rights." Compl., ¶ 17. Plaintiff appears to proceed on her conspiracy claim either under Section 1985 or Section 1983.

Section 1985(3) [3] provides:

If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of laws, or of equal privileges and immunities under the laws [and] if one or more persons engaged therein do, or cause to be done any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action....

A properly pleaded claim under § 1985(3) requires allegations of: 1) a conspiracy, 2) for the purpose of depriving a person or class of equal protection or privileges and immunities; 3) an act in furtherance thereof; and 4) injury or deprivation of rights. *See Griffin v. Breckenridge*, 403 U.S. 88,

---

**3.** While Plaintiff does not specify in her complaint under what statutory provision she brings her conspiracy claim, the only provision of Section 1985 that applies to the facts of the instant case is subsection (3). Subsection (1) deals with conspiracies to prevent officers from performing their duties while subsection (2) involves conspiracies to intimidate parties, witnesses, or jurors in a legal action.

102–103, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *United Brotherhood of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). Additionally, "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790 (footnote omitted). In the Ninth Circuit, Section 1985(3) extends "beyond race only when the class in question can show that there has been a governmental determination that its members require and warrant special federal assistance in protecting their civil rights." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir.1992) (citations and internal quotations omitted).

Plaintiff fails to demonstrate a conspiracy under Section 1983(5) for a number of reasons. First, there is no evidence that there was some type of discriminatory racial or class-based animus on the part of Thompson or that decedent MacEachern is part of a protected class. In addition, Plaintiff has failed to plead the alleged conspiracy with any degree of specificity, and her opposition also fails to identify concrete facts probative of a conspiracy. There are no factual allegations any where in the Complaint or in Plaintiff's opposition that Defendant Thompson, during or leading up to his 67–second encounter with MacEachern, conspired with anyone to shoot MacEachern. Thus, Plaintiff's allegation that Defendants conspired to deprive MacEachern of constitutional rights lacks the factual specificity required to properly plead a conspiracy to violate civil rights. *See Karim–Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim under this section must allege facts to support the allegation that defendants conspired together. A mere allegation of conspiracy without factual specificity is insufficient." (citing *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir.1984); *Burnett v. Short*, 441 F.2d 405, 406 (5th Cir.1971))). Plaintiff's claims fail even to put Defendants on notice of who entered the alleged conspiracy, when, what acts were committed in furtherance of the conspiracy, and how those acts harmed Plaintiff. *See Id.*; *see also Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1039 (9th Cir. 1990) ("A mere allegation of conspiracy without factual specificity is insufficient to support a claim.")

In addition, Plaintiff's claim that Defendants conspired to cover-up the true facts related to the shooting are similarly problematic. First, Plaintiff again fails to provide the requisite specificity in her Complaint. Second, none of the evidence presented by Plaintiff in her opposition clearly supports such contentions, even looking at the facts in the light most favorable to Plaintiff. Plaintiff cites to three facts in her opposition as evidence of the conspiracy to cover-up: (1) the failure of Defendant Thompson's car video to work and therefore record the shooting; (2) the "vast contradictions" between Thompson's recitation of the events and other witnesses; and (3) the lack of fingerprints on the knife and the Defendants' failure to explain such a lack. Pl.'s Opp. at 17. However, the Court cannot see how any reasonable jury could conclude that this evidence makes the requisite showing of a conspiracy between Officer Thompson and other unidentified City and MBPD employees. Indeed, Officer Thompson's recitation of the facts is not so starkly different from that of the witness testimony presented by Plaintiff. Further, Plaintiff provides no affirmative evidence that the failure of the car video was anything other than inadvertence. And, no one is denying that latent finger prints were not found on the knife, so failure to provide an explanation does not evidence a cover-up. Third, Plaintiff makes no argument how a con-

spiracy to cover-up or misstate the facts of the shooting has led to a constitutional deprivation. The only alleged constitutional deprivation relates to the actual shooting. Thus, activity after the shooting does not yet clearly implicate a deprivation of anyone's constitutional rights.

■ Plaintiff can also bring her conspiracy claim directly under Section 1983. To establish a claim for conspiracy under Section 1983, Plaintiff must demonstrate "an agreement or 'meeting of the minds' to violate constitutional rights." *Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir.1983). Further, "[t]o state a claim for conspiracy to violate one's constitutional rights under section 1983, the plaintiff must state specific facts to support the existence of the conspiracy." *Burns v. County of King,* 883 F.2d 819, 821 (9th Cir.1989) (citing *Coverdell v. Dep't of Social and Health and Services,* 834 F.2d 758, 769 (9th Cir. 1987)); *see also, Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (" 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct' ")(*quoting Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993)). However, a conspiracy under Section 1983 fails for the same reasons identified above and will not be reiterated by the Court. Thus, all Defendants are entitled to summary judgment on the conspiracy allegations.

### H. Attorneys' Fees

■ "Attorneys' fees in civil rights cases should only be awarded to a defendant in exceptional circumstances." *Barry v. Fowler,* 902 F.2d 770, 773 (9th Cir.1990). "The mere fact that a defendants prevails does not automatically support an award of fees. A prevailing civil rights defendant should be awarded attorney's fees not routinely, not simply because [the defendant] succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless, or vexatious." *Patton v. County of Kings,* 857 F.2d 1379, 1381 (9th Cir.1988). Defendants would have this Court believe that Plaintiff's law suit was at all time completely frivolous and meritless. However, while Plaintiff's counsel certainly has made a number of poor tactical decisions, this Court cannot find that the Section 1983 lawsuit was wholly unjustified when the Plaintiff's son was shot and killed in a confrontation with a police officer. Thus, exceptional circumstances do not warrant awarding Defendants their attorney's fees.

### IV. DISPOSITION

For the foregoing reasons, the Court hereby GRANTS Defendants' Motion for Summary Judgment. However, the Court DENIES Defendants' Request for Attorney's Fees.

IT IS SO ORDERED.