CHIEN VAN BUI, et al., Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.

No. C 11-04189 LB

United States District Court, N.D. California, San Francisco Division.

Signed July 25, 2014

Andrew Charles Schwartz, Thomas Andrew Seaton, Casper Meadows Schwartz & Cook A Professional Corporation, Walnut Creek, CA, Edwin Ken Prather, Law Offices of Edwin Prather, San Francisco, CA, for Plaintiffs.

Sean F. Connolly, City Attorney's Office, San Francisco, CA, for Defendants.

[Re: ECF No. 81]

## AMENDED[1] ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAUREL BEELER, United States Magistrate Judge

### INTRODUCTION

In this civil rights action, Chien Van Bui and Ai Huynh (collectively, "Plaintiffs"), the parents of decedent Vinh Van Bui, known as Tony Bui ("Bui"), sued San Francisco Police Officers Austin Wilson ("Officer Wilson") and Timothy Ortiz ("Officer Ortiz"), and the City and County of San Francisco ("CCSF") (collectively, "Defendants") for the death of their son. Complaint, ECF No. 1.[2] Defendants move for summary judgment. Motion, ECF No. 81. The court held a hearing on the matter on June 26, 2014. 6/26/2014 Minute Order, ECF No. 136. Upon consideration of the admissible evidence submitted, the arguments of counsel, and the applicable authority, the court **GRANTS** summary judgment in favor of Defendants with respect to Plaintiffs' *Monell* claim and otherwise **DENIES** Defendants' motion.

### STATEMENT

### I. FACTS

Defendants Austin Wilson ("Officer Wilson") and Timothy Ortiz ("Officer Ortiz") were police officers with the San Francisco Police Department ("SFPD") and employed by the City and County of San Francisco ("City"). Joint Statement of Undisputed Facts ("UF"), Fact 1. At all times relevant to this action, they were acting in the course and scope of their employment with the SFPD. UF, Fact 1.

On December 29, 2010, Officer Wilson and Officer Ortiz were in uniform and driving a marked police car. UF, Fact 1. Officer Wilson was 6' tall and weighed 198 pounds, Wilson Depo. 2 at 69:18–70:1, Schwartz Decl., Ex. Q, ECF No. 121–17, and Officer Ortiz was 5'9' tall and weighed between 175 and 185 pounds, Ortiz Depo. 2 at 104:19–22, Schwartz Decl., Ex. L, ECF No. 121–12. Police Inspector Kevin Whitfield, who is not a defendant to this action, also was working that day. UF, Fact 1. Vinh Van Bui, known as Tony Bui ("Bui"), lived at 629 Bacon Street, San Francisco, a flat which he shared with several family members, including his sisters Cindy Thanh Tran ("Tran") and Lan Herrera ("Herrera"), Herrera's daughter Melina H., his father Plaintiff Chien Van Bui ("Chien Van Bui") and his mother Plaintiff Ai Huynh ("Huynh"). UF, Fact 2. Bui, who was 46 years old and was 5'6' tall and weighed 135 pounds, suffered from a mental condition and was easily agitated by loud noises. UF, Fact 4; Marvin C. Depo. at 20:16–22, Schwartz Decl., Ex. B, ECF No. 121–2; Autopsy Report, Schwartz Decl., Ex. CC, ECF No. 121–29 at 2. Specifically, Bui had suffered from schizophrenia since at least 1995, Chien Van Bui Depo. at 42:9–25, Schwartz Decl., Ex. A, ECF No. 121–1; Medical Records at 87–89, Schwartz Decl., Ex. AA, ECF No. 121–27, and since 1997, as a side effect of his antipsychotic medication, he also suffered from tardive dyskinesia (i.e. "late-onset abnormal movement"), Shyn Depo. at 33:20–34:17, 38:21–39:7, Schwartz Decl., Ex. N, ECF No. 121–14; Medical Records at 282,

---

1. The court issues this amended order primarily to clarify certain citations to the record, the evidence the court considered when making its decisions, and the court's reasoning regarding its denial of qualified immunity.

2. Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

Schwartz Decl., Ex. AA, ECF No. 121–27, which sometimes caused his trunk and extremities to rock involuntarily and also caused him to sometimes walk slowly, one step at a time, Marvin C. Depo. at 75:23–77:12, Schwartz Decl., Ex. B, ECF No. 121–2; Shyn Depo. at 33:20–34:17, 34:21–36:1, 38:21–39:7, 51:14–53:16, 57:14–20, Schwartz Decl., Ex. N, ECF No. 121–14; Tran Depo. at 21:110, 24:22–25:14, 34:24–35:4, Schwartz Decl., Ex. O, ECF No. 121–15. Bui did not have a criminal record. Tran Decl. ¶ 4, ECF No. 104.

On the afternoon of December 29, 2010, Melina H., who was then 15 years old, had approximately 15 of her teenaged friends over at her home at 629 Bacon Street. UF, Fact 3. Sharon. H. was one of these friends. UF, Fact 3. At some point in time, Sharon H. entered the bathroom and slammed the door behind her, which startled and agitated Bui. UF, Fact 4; Sharon H. Depo. at 20:36, Schwartz Decl., Ex. I, ECF No. 121–9. When Sharon H. came out of the bathroom and was going to the kitchen, Bui stuck her in the lower back with an X–Acto knife, which had a blade that was approximately 1 inch long. UF, Fact 5; Sharon H. Depo. at 25:6–26:16, 72:20–73:18, Connolly Decl., Ex. N, ECF No. 91; Wilson Depo. at 70:13–17, Schwartz Decl., Ex. Q, ECF No. 121–17; Wilson Decl., Ex. A (photograph of the X–Acto knife). The other teenagers told Sharon H. that she was bleeding and apparently injured. Sharon H. Depo. at 27:8–28:8, Connolly Decl., Ex. N, ECF No. 91. Melina H. then telephoned her mother (Herrera), who was not at the house, and told her that "Tony [Bui] cut Sharon [H]." UF, Fact 6. Herrera told Melina H. to call "911." UF, Fact 7. Melina H. called 911 and reported: "We have a man that's like mental here and just slapped somebody—one of my friends, and yeah, we need him out." UF, Fact 8.

911 Dispatch broadcasted to SFPD officers in the field that Bui had "just slapped [Melina H.'s] friend" and that the "reporting party" said Bui was "mentally challenged." UF, Fact 9. Moments later, Melina H. clarified, telling the 911 operator the following: "[Bui] has like a mini, a little mini like knife thing. It's sharp. And when [her friend] came out [of the bathroom], he said 'Do you want me to stab you?' and he hit her with the little pointy thing. . . . She's bleeding. Yeah, he stabbed her." UF, Fact 10. Based on this additional information, 911 Dispatch broadcasted: "Subject has a pointed object that he stuck the victim with in the back." UF, Fact 11. 911 Dispatch also transmitted through the computer-assisted dispatch system that Bui had "stabbed [Melina H's] friend" and was "mentally challenged," that Melina H. was "not sure if [Bui] has the knife," and that the injury was "minor." UF, Fact 11; Borg Decl., Ex. J, ECF No. 94–10. 911 Dispatch also sent to the police vehicle computer the following text: "TX: Susp is Toni who is mentally challenged." Wilson Depo. at 42:5–15, Schwartz Decl., Ex. Q, ECF No. 121–17. When responding to the dispatch, Officers Ortiz and Wilson had access to the dispatch information through a vehicle computer, working radios and, as to Officer Wilson, an earpiece, Ortiz Depo. at 32:22–25, 54:17–23, 80:10–17, Schwartz Decl., Ex. L, ECF No. 121–12; Wilson Depo. at 32:12–19, Schwartz Decl., Ex. Q, ECF No. 121–17; Ortiz Decl. ¶ 10, ECF No. 82; Wilson Decl. ¶ 14, ECF No. 84, but Officers Ortiz and Wilson and Inspector Whitfield say they did not know at that time that Bui had mental health problems, Ortiz Decl. ¶ 10, ECF No. 82; Whitfield Decl. ¶ 14, ECF No. 83, Wilson Decl. ¶ 10, ECF No. 84.

At about 3:53 p.m., Officers Ortiz and Wilson arrived at 629 Bacon Street. UF, Fact 12. Inspector Whitfield also re-

sponded, arriving at 629 Bacon Street at about the same time as Officers Ortiz and Wilson. UF, Fact 13. The parties dispute whether the officers treated the call as an emergency. Plaintiffs say that the officers did not and provide evidence that the officers' sirens and lights were off, the officers were not running, and the officers did not discuss tactics when approaching the flat. Ortiz Depo. at 45:13–20, 48:18–25, 55:11–14, Schwartz Decl., Ex. L, ECF No. 121–12; Wilson Depo. at 55:19–21, 58:1–8, 66:25–68:24, Schwartz Decl., Ex. Q, ECF No. 121–17. Defendants, on the other hand, provide evidence that the 911 call was classified as an "A priority" call, giving it the highest priority, Goley Depo. at 17:20–18:14, Connolly Reply Decl., Ex. D, ECF No. 129–4 at 17:20–18:14; Borg Decl., Ex. B, ECF No. 94–2; Borg Decl., Ex. J, ECF No. 9410, and that the officers responded, at least initially, to the call as a "Code 3"—with their lights and sirens on, Ortiz Decl. ¶ 2, ECF No. 82; Wilson Decl. ¶ 2, ECF No. 84. Their guns were holstered, Ortiz Decl. ¶ 8, ECF No. 82; Wilson Decl. ¶ 7, ECF No. 84, they had pepper spray and batons on their persons, and they also had an Extended Range Impact Weapon ("ERIW")—a shotgun that shoots bean bags—in their car, Ortiz Depo. at 28:2–4, 46:4–12, Schwartz Decl., Ex. L, ECF No. 12112; Wilson Depo. at 35:18–37:4, Schwartz Decl., Ex. Q, ECF No. 121–17.

The officers either knocked on the door or rang the doorbell, and one of the teenagers at Melina H.'s get-together, Aaron L., opened the door and allowed the officers into the house. UF, Fact 14. Upon entering, Officers Ortiz and Wilson and Inspector Whitfield saw a group of teenagers in the living room, and at least one officer asked whether anyone had been stabbed. UF, Fact 15; UF, Fact 16; Ortiz Decl. ¶¶ 4–6, ECF No. 82; Whitfield Decl. ¶ 4, ECF No. 83; Jason W. Depo. at

33:10–24, Connolly Decl., Ex. H, ECF No. 88; Sharon H. Depo. at 36:11–20, Connolly Decl., Ex. N, ECF No. 91; Marvin C. Depo. at 40:24–41:9, 42:7–13, 73:20–24, Connolly Decl., Ex. J, ECF No. 89; Tran Depo. at 13:9–11; 14:10–15:17, Connolly Decl., Ex. P, ECF No. 92–1; Ortiz Depo. at 49:5–12, Schwartz Decl., Ex. L, ECF No. 121–12. Initially, no one in the room acknowledged that anyone had been stabbed, no one appeared to be in distress, and Bui's sister, Tran, the only adult present, said nothing had happened. UF, Fact 16; Ortiz Decl. ¶ 5, ECF No. 82; Sharon H. Depo. at 39:1–6, Connolly Decl., Ex. N, ECF No. 91; Ortiz Depo. at 49:13–22, Schwartz Decl., Ex. L, ECF No. 12112. Tran may also have told the police officers to leave. See Sharon H. Depo. at 39:3–40:2, Connolly Decl., Ex. N, ECF No. 91; Sharon H. Depo. at 66:11–16, Schwartz Decl., Ex. I, ECF No. 121–9; Whitfield Depo. at 62:7–16, Schwartz Decl., Ex. P, ECF No. 121–16; Tran Decl. ¶ 2, ECF No. 104; but see Tran Depo. at 14:2–17:15, 57:15–20, 58:20–23, Connolly Reply Decl., Ex. P, ECF No. 129–16 at 14:2–17:15. No one had yet informed Tran that anyone had been stabbed, that Melina H. had called the police, or why Melina H. had done so. UF, Fact 19. Relying on the information that Tran provided to him (i.e., that nothing had happened), Officer Ortiz radioed Dispatch at 3:45:43 p.m. and stated that the call had "no merit." UF, Fact 17.

Thereafter, Inspector Whitfield again asked the group of teenagers if anyone had been "stabbed." Whitfield Decl. ¶ 5, ECF No. 83. This time, Sharon H. was pointed out as having been cut, and she raised her hand in confirmation. UF, Fact 20. Inspector Whitfield asked Sharon H. where she had been stabbed, and she showed him the injury on her back, which Inspector Whitfield describes as a "puncture wound." UF, Fact 21. Tran heard

Inspector Whitfield confirm with Sharon H. that she had been stabbed. UF, Fact 22. Inspector Whitfield's observation of the puncture wound confirmed that a stabbing or other such injury had occurred, but Sharon H. stated that she was not hurt and did not need a paramedic. Whitfield Decl. ¶¶ 5–6, ECF No. 83; Whitfield Depo. at 45:6–8, Schwartz Decl., Ex. P, ECF No. 121–16. Officers Ortiz and Wilson saw Sharon H. lift her shirt and point to her back, and Officer Ortiz saw a wound on her back, which looked to him like a fresh cut. Ortiz Decl. ¶ 6, ECF No. 82; Wilson Decl. ¶ 6, ECF No. 84. Having confirmed that Sharon H. had been stabbed, Officers Ortiz and Wilson asked with urgency the location of the man with the knife. Ortiz Decl. ¶ 6, ECF No. 82; Whitfield Decl. ¶ 6, ECF No. 83; Wilson Decl. ¶ 6, ECF No. 84; Tran Depo. at 14:10–15:22, Connolly Decl., Ex. P, ECF No. 92–1; Marvin C. Depo. at 41:3–15, Connolly Decl., Ex. J, ECF No. 89. Certain people in the house informed Officers Ortiz and Wilson that Bui was in the house, by either pointing down the hall or telling the officers. UF, Fact 25.

Hearing that a stabbing had occurred, seeing the wound, and hearing that the perpetrator was in the house corroborated for the officers that a crime had been committed and that the suspect was located on the premises. Ortiz Decl. ¶ 6, ECF No. 82; Whitfield Decl. ¶ 6, ECF No. 83; Wilson Decl. ¶ 6, ECF No. 84. The officers did not know at that time whether Bui still possessed the X–Acto Knife. Ortiz Depo. at 59:20–22, Schwartz Decl., Ex. L, ECF No. 121–12. As they advanced, Tran tried to inform the officers again of Bui's mental illness, and Plaintiffs say that the officers shoved her aside. Marvin C. Depo. at 70:25–71:20, Schwartz Decl., Ex. B, ECF No. 121–2; Melina H. Depo. at 69:6–12, 71:1–25, Schwartz Decl., Ex. H, ECF No. 121–8; Aaron L. Depo. at 21:13–

17, 21:25–22:2, 25:7–11, 39:14–19, Schwartz Decl., Ex. K, ECF No. 121–11; Simon P. Depo. at 26:2–9, 26:24–27:19, 42:3–6, Schwartz Decl., Ex. M, ECF No. 121–13; Tran Depo. at 16:1–15, 17:7–15, 55:2–9, Schwartz Decl., Ex. O, ECF No. 121–15; Sandra W. Depo. at 70:22–71:3, 76:15–20, Schwartz Decl., Ex. T, ECF No. 121–20; Tran Decl. ¶ 3, ECF No. 104. In any case, Officer Ortiz and Officer Wilson say that they do not recall Tran telling them that Bui was mentally ill. Ortiz Depo. at 54:17–55:8, 56:24–57:10, Schwartz Decl., Ex. L, ECF No. 121–12; but see Tran Depo. at 16:7–10, 17:23–24, Schwartz Decl., Ex. O, ECF No. 121–15 (testifying that one of the officers told her that he knew Bui was mentally ill). Officers Ortiz and Wilson did not develop a plan to extract Bui from the bathroom. Ortiz Depo. at 55:11–14, Schwartz Decl., Ex. L, ECF No. 121–12; Wilson Depo. at 96:17–97:11, Schwartz Decl., Ex. Q, ECF No. 121–17.

Officers Ortiz and Wilson walked down the hallway toward the bathroom, looking for Bui. UF, Fact 26. Officers Ortiz knocked on the bathroom door and ordered Bui out. Ortiz Decl. ¶ 7, ECF No. 82; Melina H. Depo. at 75:18–24, Schwartz Decl., Ex. H, ECF No. 121–1; Sharon H. Depo. at 38:6–23, 40:14–19, Schwartz Decl., Ex. I, ECF No. 121–9; Andrew K. Depo. at 32:24–33:4, Schwartz Decl., Ex. J, ECF No. 121–10; Simon P. Depo. at 26:5–9, Schwartz Decl., Ex. M, ECF No. 121–13; Jason W. Depo. at 37:2–6, Schwartz Decl., Ex. R, ECF No. 121–18. Soon therafter, the bathroom door opened inward, and Bui emerged with the X–Acto knife in his hand. UF, Fact 26; see Wilson Decl., Ex. A, ECF No. 84–1 (photographs of the X–Acto knife). Officers Ortiz and Wilson then pulled out their guns and pointed them at Bui. UF, Fact 28.

The parties agree about the following facts leading to Bui's shooting. After the

officers pulled out their guns and pointed them at Bui, they warned him to drop the knife. UF, Fact 29. Bui did not drop the knife. *Id.* Bui advanced down the hallway while Officers Ortiz and Wilson continued to order Bui to drop the knife. UF, Fact 30. The officers backed up somewhere in the living room. UF, Fact 31. Bui did not stop. UF, Fact 32. The officers shot three times at Bui. UF, Fact 33. Two of the shots hit Bui, who was injured fatally. UF, Fact 36.

The parties otherwise dispute much of what happened from the time that Bui opened the bathroom door to the moment he was shot. According to Plaintiffs, Bui had the X–Acto knife down by his side. Melina H. Depo. at 78:12–14 ("[Bui] started walking out really slowly. I saw the X–Acto knife; it was by his side."), 79:9–11 ("[Bui] was walking very slowly, with his X–Acto knife by his side...."), 79:22–25 ("[T]he police were backing up really fast, and [Bui] was, like, going extremely, like, slow, walking, and with the thing on his side...."), Schwartz Decl., Ex. H, ECF No. 121–8; Tran Depo. at 21:11–22:1 ("And then he had his hand down. His hand never moved. He did not move his hand at all. He did not have any action that says he's trying to provoke the police."), 69:23–70:5 ("Q: Did it appear to you that [Bui] was pointing whatever it was that you saw in his hand toward the police officers? A: No. I don't think he ha[d] any action to say that he's trying to attack the police. Q: Was he pointing the object in his hand at the police officers or not? A: No, no. Never. I didn't see."), Schwartz Decl., Ex. O, ECF No. 121–15. Plaintiffs say that Bui, with the X–Acto knife still by his side, began to slowly shuffle down the hall and toward the officers and the front door of the flat. Marvin C. Depo. at 76:6–77:10 (Bui shuffled), Schwartz Decl., Ex. B, ECF No. 121–2; Melina H. Depo. at 78:4–81:7 (Bui walked extremely slowly down the hall and toward the officers and the front door, and he had the knife at his side), Schwartz Decl., Ex. H, ECF No. 121–8; Simon P. Depo. at 44:6–18 (Bui walked slowly toward the officers), 57:19–58:1 (Bui advanced slowly toward the officers), Schwartz Decl., Ex. M, ECF No. 121–13; Tran Depo. at 20:22–22:4 (Bui moved slowly), 62:11–20 (Bui walked very slowly out of the bathroom), 63:15–17 (Bui walked very slowly toward the officers), 65:21–66:2 (Bui's hands were straight at his sides as he walked down from the bathroom towards the living room), 69:17–70:5 (Bui did not point anything at the officers), Schwartz Decl., Ex. O, ECF No. 121–15. Plaintiffs further say that Bui did not threaten the police with the knife, but instead assumed a defensive, protective, cringing attitude where he turned away from the Officers and bent at the waist, keeping the hand with the knife at his side and bringing the other hand up with an open palm. Melina H. Depo. at 79:5–82:9 (Bui held knife at his side), Schwartz Decl., Ex. H, ECF No. 121–8; Aaron L. Depo. at 22:3–4 (Bui came out of the bathroom in a self-defense position), 23:21–25:5 (Bui crouched in self-defense position and had one hand open), 39:20–23 (Bui was not aggressive and was in a defense stance), Schwartz Decl., Ex. K, ECF No. 121–11; Simon P. Depo. at 57:19–58:1 (Bui advanced slowly), Schwartz Decl., Ex. M, ECF No. 121–13; Tran Depo. at 21:18–22:19 (Bui's hands were down), 65:21–66:2 (same), 69:17–70:5 (Bui never pointed anything at the officers), Schwartz Decl., Ex. O, ECF No. 121–15. The officers ordered that Bui drop the knife, but it appeared that he did not understand them. Sharon H. Depo. at 69:24–70:2 (Bui did not appear to understand the officers' commands), Schwartz Decl., Ex. I, ECF No. 121–9; Simon P. Depo. at 46:23–47:3 (same), Schwartz

Decl., Ex. M, ECF No. 12113; Tran Depo. at 20:20–23 (Bui could not hear what the officers were telling him), Schwartz Decl., Ex. O, ECF No. 121–15; *but see* Sharon H. Depo. at 70:15–71:25 (does not actually know if Bui understood the officers' commands), Schwartz Decl., Ex. I, ECF No. 121–9. The officers backed up to somewhere in the living room. UF, Fact 31. When approximately 6 to 8 feet away from Bui, the officers fatally shot Bui twice, with Officer Ortiz firing two shots (one of which missed Bui), and Officer Wilson firing one. UF, Fact 33; UF, Fact 34; Herrmann Decl. ¶¶ 3–13, ECF No. 103. The bullet from Officer Ortiz's gun "passed primarily from [Bui's] left to his right, downward at an angle of approximately 30 degrees and from the front of his body toward the back at an angle of approximately 30 degrees." Herrmann Decl. ¶ 5, ECF No. 103. The bullet from Officer Wilson's gun primarily passed through Bui "downward at an angle of approximately 55 degrees" and "was directed from [his] right to left at an angle of approximately 15 degrees and from front to back at an angle of approximately 35 degrees." Herrmann Decl. ¶ 6, ECF No. 103. "The shots were not fired with the officers and [Bui] facing each other in the erect position," Herrmann Decl. ¶ 8, ECF No. 103, Bui was turned away to his right from Officer Ortiz, Herrmann Decl. ¶ 10, ECF No. 103, and the bullets may have hit him at a downward angle either because he was shorter than the officers, he was falling from having been shot, or was cringing and trying to avoid being shot, Herrmann Decl. ¶¶ 9–13, ECF No. 103.

Defendants present a different story. They say that when Bui emerged from the bathroom, his hands were up near his chest and he walked towards Officers Ortiz and Wilson while waving the X–Acto knife in the air in an aggressive and menacing manner. Ortiz Decl. ¶ 7, ECF No. 82; Whitfield Decl., ¶ 9, ECF No. 83; Wilson Decl., ¶ 8, ECF No. 84; Wilson Depo. at 111:11–112:9, Connolly Decl., Ex. S, ECF No. 93–2. They say that Bui was close enough to Officers Ortiz and Wilson to be able to stab either of them if he lunged towards them. Wilson Decl. ¶ 9, ECF No. 84; Whitfield Decl. ¶ 10, ECF No. 83. Officers Ortiz and Wilson repeatedly told Bui to drop the knife, but he did not do so. UF, Fact 29; Ortiz Decl. ¶¶ 8–9, ECF No. 82; Whitfield Decl. ¶¶ 8, 10, ECF No. 83; Wilson Decl. ¶¶ 9–10, ECF No. 84; Sharon H. Depo. at. 43:4–17, 44:4–9, 58:2–4, Connolly Decl., Ex. N, ECF No. 91; Jason W. Depo. at 37:2–15, 40:12–14, 41:18–42:5, 45:2–11, Connolly Decl., Ex. H, ECF No. 88; Marvin C. Depo. at 45:7–46:2, Connolly Decl., Ex. J, ECF No. 89; Andrew K. Depo. at 34:16–25, Connolly Decl., Ex. C, ECF No. 86–3; Aaron L. Depo. at 19:16–21, 22:3–6, 24:7–12, 42:22–43:6, 43:12–44:9, Connolly Decl., Ex. B, ECF No. 86–2; Simon P. Depo. at 29:3–7, 57:16–21, Connolly Decl., Ex. O, ECF No. 92. Still holding the knife in the air in an aggressive manner, Bui continued down the hallway (at a regular or quick pace) and toward Officers Ortiz and Wilson, and Officers Ortiz and Wilson continued to order Bui to drop the knife. UF, Fact 30; Ortiz Decl. ¶¶ 8–9, ECF No. 82; Wilson Decl., ¶¶ 8–9, ECF No. 84; Tran Depo. at 67:14–25, Connolly Decl., Ex. P, ECF No. 92–1; Sharon H. Depo. at 44:4–17, 56:7–58:4, Connolly Decl., Ex. N, ECF No. 91; Andrew K. Depo. at 34:5–9, 34:16–25, Connolly Decl., Ex. C, ECF No. 86–3; Sandra W. Depo. at 57:14–20, Connolly Decl., Ex. M, ECF No. 90–2; Jason W. Depo. at 39:9–10, 41:1–42:5, 47:3–9, Connolly Decl., Ex. H, ECF No. 88; Marvin C. Depo. at 58:5–11, 77:4–8, 90:3–8, Connolly Decl., Ex. J, ECF No. 89; Jonathan Y. Depo. at 47:3–48:4, 48:9–11, 61:8–17, Connolly Decl., Ex. I, ECF No. 88–1.

Facing Bui, the officers, with their guns drawn, walked backwards and side-by-side and retreated into the living room. Ortiz Decl. ¶ 8, ECF No. 82; Wilson Decl. ¶ 10, ECF No. 84; Andrew K. Depo. at 34:5–9, Connolly Decl., Ex. C, ECF No. 86–3; Marvin C. Depo. at. 47:11–14, Connolly Decl., Ex. J, ECF No. 89. The officers backed up to somewhere in the living room, UF, Fact 31, and continued to order Bui to drop the knife, Ortiz Decl. ¶ 9, ECF No. 82; Whitfield Decl. ¶ 10, ECF No. 83; Wilson Decl. ¶ 10, ECF No. 84; Andrew K. Depo. at 35:10–13, Connolly Decl., Ex. C, ECF No. 86–3; Jason W. Depo. at 46:2–11, Connolly Decl., Ex. H, ECF No. 88; Tran Depo. at 63:18–20, 66:21–25, Connolly Decl., Ex. P, ECF No. 92–1. But Bui did not stop. UF, Fact 32. Instead, Bui continued to advance toward Officers Ortiz and Wilson and threatened them with the knife. Ortiz Decl. ¶ 9, ECF No. 82; Wilson Decl. ¶¶ 10–11, ECF No. 84; Jason W. Depo. at 42:945:11, Connolly Decl., Ex. H, ECF No. 88. The officers ran out of room to retreat because some of the teens and living room furniture were in the way. Ortiz Decl. ¶ 9, ECF No. 82; Whitfield Decl. ¶ 10, ECF No. 83; Wilson Decl. ¶ 11, ECF No. 84; Jason W. Depo. at 42:9–43:3, Connolly Decl., Ex. H, ECF No. 88. Believing that they and some of the teenagers were at imminent risk of being stabbed or otherwise seriously injured by Bui, the officers shot three times at Bui. UF, Fact, 33; UF, Fact 35; Ortiz Decl. ¶ 9, ECF No. 82; Wilson Decl. ¶ 11, ECF No. 84; Ortiz Depo at 97:24–99:19, Connolly Decl., Ex. L, ECF No. 90–1; Wilson Depo. at 117:23–118:8, Connolly Decl., Ex. S, ECF No. 93–2. When they shot, the officers were approximately 4 to 5 feet away from Bui. Whitfield Decl. ¶ 10, ECF No. 83; Wilson Decl. ¶ 11, ECF No. 84; Jonathan Y. Depo. at 60:24–61:7, Connolly Decl., Ex. I, ECF No. 88–1. Two of the shots hit the front of Bui's body, fatally injuring him. UF, Fact 34; Smith Decl. ¶ 10, ECF No. 85.

Between 45 and 90 seconds elapsed between the time the officers entered the house and the time shots were fired. UF, Fact 36. Approximately 10–15 seconds elapsed from the time the officers first had contact with Bui at the bathroom door to when the shots were fired. Ortiz Depo. at 109:18–25, Connolly Decl., Ex. L, ECF No. 90–1. The officers are trained that, when circumstances require the use of their guns, they should aim for the body center mass of the target individual. Ortiz Decl. ¶ 9, ECF No. 82; Wilson Decl. ¶ 11, ECF No. 84. Both Officers Ortiz and Wilson attended Peace Officer Standards and Training ("POST") academies. Corriea Depo. at 71:7–73:1, Schwartz Decl., Ex. C, ECF No. 121–3; Ortiz Depo. at 14:4–13, 19:19–20:8, Schwartz Decl., Ex. L, ECF No. 121–12; Wilson Depo. at 16:5–17:3, Schwartz Decl., Ex. Q, ECF No. 121–17; see Clark Decl. ¶¶ 2(b), 5–9, Exs. C–E, ECF No. 124.

While it is undisputed that Officers Ortiz and Wilson told Bui to drop the knife, UF, Fact 29; UF, Fact 30, it is unclear whether they told him that they would shoot him if he did not do so. *Compare* Ortiz Decl. ¶ 8, ECF No. 82 (testifying that he warned he would shoot); Aaron L. Depo. at 22:4–6 ("The police pulled their guns on [Bui] and said, 'Drop the weapon or we'll shoot,' or something like that."), 44:2–9 (" 'Then the cops warned they would shoot.' "), *with* Wilson Depo. at 71:12–13, 71:21–23, 112:20–113:5, 114:22–115:23, Schwartz Decl., Ex. Q, ECF No. 121–17 (no mention of a warning of imminent force); Wilson Decl. ¶ 10, ECF No. 84 (same); Marvin C. Depo. at 45:12–46:7, 77:113–14, Schwartz Decl., Ex. B, ECF No. 121–2 (same); Joanne G. Depo. at 32:21–33:7, Schwartz Decl., Ex. E, ECF No. 121–5 (same); Melina H. Depo. at 87:13–23, Schwartz Decl.,

Ex. H, ECF No. 121–8 (same); Sharon H. Depo. at 43:4–17, 69:19–22, 70:21–23, Schwartz Decl., Ex. I, ECF No. 1219 (same); Andrew K. Depo. at 34:16–22, 40:20–25, 53:5–9, Schwartz Decl., Ex. J, ECF No. 121–10 (same); Simon P. Depo. at 26:13–15, 57:16–18, Schwartz Decl., Ex. M, ECF No. 121–13 (same); Tran Depo. at 21:24–22:1, 66:21–25, Schwartz Decl., Ex. O, ECF No. 121–15 (same); Wilson Depo. at 71:21–23, 112:20–113:5, 114:22–115:2, Schwartz Decl., Ex. Q, ECF No. 121–17 (same); Jason W. Depo. at 37:11–13, 38:16–17, 40:12–14, Schwartz Decl., Ex. R, ECF No. 121–18 (same); Sandra W. Depo. at 56:2–18, 56:23–57:4, Schwartz Decl., Ex. T, ECF No. 121–20 (same).

## II. PROCEDURAL HISTORY

■ Plaintiffs filed their complaint in this court on August 24, 2011. Complaint, ECF No. 1. They brought: (1) as successor in interest to Bui's estate and pursuant to 42 U.S.C. § 1983[3], a claim against Officers Ortiz and Wilson for violation of Bui's Fourth Amendment right to be free from excessive force; (2) on their own behalf and pursuant to 42 U.S.C. § 1983, a claim against Officers Ortiz and Wilson for interference with their Fourteenth Amendment due process liberty interest in their parental relationship with Bui; (3) as successor in interest to Bui's estate and pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a claim against CCSF for failure to train; and (4) on their own behalf and pursuant to California Civil Procedure Code § 377.60, a

claim against CCSF (under a theory of respondeat superior) for wrongful death[4]. *Id.* ¶¶ 29–53.

Defendants now move for summary judgment on all four claims. Motion, ECF No. 81. Plaintiffs oppose the motion, except as to their *Monell* claim. Opposition, ECF No. 120; *id.* at 9 n.1. Defendants filed a reply. Reply, ECF No. 110. The court held a hearing on the matter on June 26, 2014. 6/26/2014 Minute Order, ECF No. 136.

## ANALYSIS

## I. LEGAL STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those that may affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

---

3. Under California's survival statute, Bui's § 1983 claim survived his death. *See* Cal.Civ. Proc.Code § 377.20; *Chaudhry v. City of Los Angeles,* 751 F.3d 1096, 2014 WL 2030195, at *4 (9th Cir. May 19, 2014) (citing *Smith v. City of Fontana,* 818 F.2d 1411, 1416–17 (9th Cir.1987), *overruled on other grounds by Hodgers–Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999) (en banc)).

4. Plaintiffs' Fourteenth Amendment claim is not duplicative of their wrongful death claim because prevailing on their Fourteenth Amendment claim entitles them to attorneys' fees, *see* 42 U.S.C. § 1988(b), while prevailing on their wrongful death does not. *See Chaudhry,* 2014 WL 2030195, at *7, 751 F.3d 1096.

absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz* Companies, Inc., 210 F.3d 1099, 1102 (9th Cir.2000); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.,* 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux,* 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. PLAINTIFFS' FOURTH AMENDMENT CLAIMS

Plaintiffs' first claim is against Officers Ortiz and Wilson for violating Bui's Fourth Amendment right to be free from excessive force. Defendants argue that Plaintiffs' claim fails because Officers Ortiz and Wilson used reasonable force and are protected by qualified immunity. As explained below, the court disagrees because genuine issues of material fact prevent the court from deciding whether a Fourth Amendment violation occurred or whether the officers are protected by qualified immunity.

### A. Genuine Issues of Material Fact Prevent the Court from Ruling that Defendants Acted Reasonably as a Matter of Law

42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Section 1983 is not itself a source for substantive rights, but rather a method for vindicating federal rights conferred elsewhere. *See Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To state a claim under § 1983, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

It is undisputed that Officers Ortiz and Wilson were acting under color of state law, and Plaintiffs allege that the officers violated Bui's Fourth Amendment right to be free from "unreasonable searches and seizures," U.S. Const. amend. IV, when they "shot [him] without lawful justification." Complaint, ECF No. 1 ¶ 30. It is

undisputed that Mr. Bui was "seized" within the meaning of the Fourth Amendment. Thus, the issue before the court is whether the force used during his seizure was "objectively reasonable." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001) (citing *Graham*, 490 U.S. at 388, 109 S.Ct. 1865).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal citations and quotations omitted). To do so, a court must evaluate "the facts and circumstances of each particular case, including [ [ (1) ] the severity of the crime at issue, [ (2) ] whether the suspect poses an immediate threat to the safety of the officers or others, and [ (3) ] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Id.* The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013). Indeed, because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.2011) (en banc), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir.2011) (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see id.* at 396–97, 109 S.Ct. 1865 (" 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' ... violates the Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

As the court described above, the two sides have dramatically different accounts of what Bui did and what happened to him. On one hand, Defendants provide admissible evidence to support their story that Bui came down the hall after the officers and attacked, or at least threatened, them with the knife—the same knife with which Bui had stabbed a teenaged girl moments before. Defendants also provide admissible evidence showing that the officers responded to the attack by raising their guns, instructing Bui to drop the knife, and retreating until they no longer safely could. It was only then, when they and some of the teenagers were at imminent risk of being stabbed or oth-

erwise seriously injured, that the officers shot Bui. If this is in fact what happened, under the applicable authority cited by Defendants, a reasonable jury could find that the officers' actions were reasonable. *See Plumhoff v. Rickard,* —— U.S. ——, 134 S.Ct. 2012, 188 L.Ed.2d 1056, 2014 WL 2178335, at *3, *8 (2014) (the officer acted reasonably in shooting the decedent who posed a grave public safety risk where it was undisputed that the decedent led several officers on a five-minute car chase that exceeded 100 miles per hour, nearly collided with more than 24 other vehicles, actually did collide with a police car, and, after crashing into different police car, reversed and maneuvered onto another street and tried to resume his flight once again); *Wilkinson v. Torres,* 610 F.3d 546, 549, 551 (9th Cir.2010) (the officer acted reasonably in shooting the decedent where, even construing the facts in the light most favorably to the plaintiffs, the decedent posed an immediate threat to the officer and others because the decedent, driving a van, led the officer on a high-speed and reckless chase, crashed into a telephone pole, ignored the officer's instruction to show his hands and stop the vehicle and instead accelerated the van while another officer was either lying fallen on the ground or standing but disoriented near the van, and the shooting officer believed the other officer to be at risk of being run over); *Blanford v. Sacramento County,* 406 F.3d 1110, 1112–14, 1117–19 (9th Cir.2005) (the officers acted reasonably in shooting the plaintiff and had probable cause to believe that the plaintiff posed a threat of serious physical harm to the officers or others where it was undisputed that the plaintiff was walking around a neighborhood while wearing a ski mask, appeared to be breaking into a house, growled or roared loudly while raising a two-and-a-half foot sword, and did not obey the officers' commands to drop it);

*Reynolds v. County of San Diego,* 84 F.3d 1162, 1164–65, 1168–70 (9th Cir.1996) (the officer acted reasonably in shooting the plaintiff where it was undisputed that the erratically-behaving plaintiff, while being arrested, suddenly picked up a knife, ignored the officer's commands to drop it, and then swung it at the officer at close range); *Roy v. Inhabitants of City of Lewiston,* 42 F.3d 691, 693, 695–96 (1st Cir. 1994) (the officer acted reasonably in shooting the plaintiff where it was undisputed that after shouting at the officer "I'll show you" and going into his house, the plaintiff returned holding two steak knives, ignored the officer's warnings to drop them, advanced toward the officer while flailing his arms, and made a kicking or lunging motion toward the officer); *Rhodes v. McDannel,* 945 F.2d 117 (6th Cir.1991) (the officer acted reasonably in shooting the decedent where it was undisputed that the decedent had previously threatened a victim with a machete, advanced toward the officers and the victim with the machete raised, and ignored the officers warnings to drop it); *Pham v. City of San Jose,* Case No.: 5:11–CV–01526–EJD, 2013 WL 5443027, at *2–3, *7 (N.D.Cal. Sept. 20, 2013) (the officers acted reasonably in shooting the decedent where it was undisputed that the decedent had a knife, had already slit one victim's throat with it, was trying to re-enter the house which contained another potential victim, ignored the officers' instructions to drop the knife, continued to resist arrest even after being tased, and charged at one of the officers); *Deng v. Loeffler,* No. 2:10–CV–00277–PMP–GWF, 2011 WL 2792340, at *1–2 (D.Nev. July 14, 2011) (the officers acted reasonably in shooting the decedent where it was undisputed that the decedent was holding two knives, running at one of the officer with both hands above his head, ignored the officer's instructions to drop the knives, and, after being shot once,

appeared as if he was going to lunge after the officer while still holding one of the knives); *Barber v. City of Santa Rosa,* No. C–08–5649 MMC, 2010 WL 5069868, at *1–2, *6 (N.D.Cal. Dec. 7, 2010) (the officer acted reasonably in shooting the decedent where it was undisputed that the decedent suffered from schizophrenia, was agitated and armed with a butcher knife, and advanced toward the officer while making verbal threats and raising the knife in an attack position); *MacEachern v. City of Manhattan Beach,* 623 F.Supp.2d 1092, 1095–96, 1103–04 (C.D.Cal.2009) (holding that the officer acted reasonably in shooting the decedent where the plaintiff did not directly counter the defendants' evidence showing that the decedent matched the description of a suspect who threatened a victim with a knife, was armed with a knife and ignored the officer's instructions to drop it, and jabbed it at the officer while taking steps toward him); *Martinez v. County of Los Angeles,* 47 Cal.App.4th 334, 339–40, 344–46, 54 Cal.Rptr.2d 772 (1996) (the officer acted reasonably in shooting the decedent where it was undisputed that the decedent appeared to be high on PCP and matched the description of a suspect who had brandished a knife, was armed with a carving knife that he held at his waist or with the blade pointed skyward, crossed a busy intersection in complete disregard to oncoming traffic and advanced toward the officer and others, ignored the officer's instruction to stop and drop the knife, and shouted at the officer that he was the one he was looking for and that if the officer did not kill him he would kill the officer).

On the other hand, in all of these other cases, it was undisputed that the plaintiff or decedent attacked, or at least threatened the safety of, the officers or others. But in this case, Plaintiffs provide admissible evidence of their own to support their story that Bui, who was much smaller than the two officers, did nothing like that—and it is Plaintiffs' view of the facts that the court must take into account for purposes of Defendants' motion. According to Plaintiffs' evidence, while Bui did have the X–Acto knife in his hand, it was always down at his side, and rather than charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall because the officers told him to come out of the bathroom. They also present evidence that suggests Bui was not directly facing the officers in the erect position and was turned away to his right from Officer Ortiz when he was shot. And if this was what happened, under the applicable authority cited by Plaintiffs, a reasonable jury could find that the officers' actions were not reasonable. *See George,* 736 F.3d at 832–33, 838–39 (if a suspect is armed (or reasonably suspected of being armed), a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat, but the mere fact that a suspect is armed with a deadly weapon does not render an officer's shooting of the suspect per se reasonable under the Fourth Amendment; if the officers "indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment"); *Glenn,* 673 F.3d at 867–69, 872–78 (while a suspect's possession of a knife is an important consideration, it is not dispositive on its own; finding that a jury could find that the officers' decision to shoot an individual holding a pocket knife, which the individual did not brandish at anyone, violated the Constitution); *Harris v. Roderick,* 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.");

*Curnow v. Ridgecrest Police,* 952 F.2d 321, 323, 325 (9th Cir.1991) (holding that deadly force was unreasonable where, according to the plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).

At the July 26, 2014 hearing, Defendants argued that it is immaterial whether Bui had the knife down at his side, because he nevertheless was "advancing" toward the officers, did not drop the knife, and had already stabbed someone, but the court does not agree that, under the authority cited above, this is true as a matter of law. The Ninth Circuit has made clear that "there are no per se rules in the Fourth Amendment excessive force context," *Mattos,* 661 F.3d at 441, and that court must "examine the totality of the circumstances, *Bryan,* 630 F.3d at 826. Here, the court believes that it matters whether Bui had the knife pointed toward the officers or down at his side, was walking normally or shuffling, was "advancing" down the hallway at a normal pace or extremely slowly, and was directly facing the officers when shot or was in a cringing, defensive position. After drawing all inferences from the underlying facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the officers acted unreasonably. The court disagrees that the case law establishes as a matter of law that the officers acted reasonably.

Plaintiffs also point to disputed facts relating to other factors bearing upon the court's inquiry. One factor is whether the officers knew or should have known that Bui had mental health problems. *See Glenn,* 673 F.3d at 875–76 (reversing the district court's grant of summary judg-

ment in part because the decedent, who was threatening only himself, obviously was emotionally disturbed and the officers should have assigned greater weight to this fact) (citing *Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir.2001) (while explicitly not adopting a per se rule establishing two different classifications for mentally disabled persons and serious criminals, still emphasizing that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed," this is a factor to be considered in determining the reasonableness of the force employed)); *Burns v. City of Redwood City,* 737 F.Supp.2d 1047, 1059–60 (N.D.Cal.2010) (denying the defendants' summary judgment motion in part because of disputed facts surrounding the officers' awareness of the plaintiff's mental health condition, which "has a role to play in the reasonableness inquiry"). Another is whether the officers (who told Bui to drop the knife) also told him that they would shoot him if he did not drop the knife and whether Bui heard or understood the warnings that they gave him.[5] *See Glenn,* 673 F.3d at 876 (reversing the district court's grant of summary judgment in part because it was not clear whether the decedent heard or understood the officers' warnings and the decedent may have been confused about whether his life was in immediate danger) (citing *Deorle,* 272 F.3d at 1284 (instructing that "warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning of the failure to do so is a factor to be considered in applying the *Graham* balancing test")).

In sum, the parties dispute facts that bear directly on whether a reasonable

---

**5.** Defendants correctly point out that warnings are required "when feasible," but this further demonstrates the inappropriateness for deciding this issue on summary judgment: given the disputes about what happened, the court cannot decide whether it was feasible for give Bui more detailed warnings that they say they did.

officer could have viewed Bui as an immediate threat to the officers or others (including whether he was shuffling, cringing, defensive, and had his hand down or whether he instead was aggressive and menacing). Resolution of these different accounts of how Bui was acting involves credibility determinations. Resolution of the disputed material facts is a job for the jury, and there is sufficient evidence for a reasonable jury to return a verdict for either party. Moreover, after drawing all inferences from the underlying facts in the light most favorable to Plaintiffs for purposes of Defendants' motion, and considering all the authority cited by Defendants, the court cannot say, as a matter of law, that the officers acted reasonably in shooting Bui. The court thus denies Defendants'

motion insofar as it asks the court conclude that the officers did not violate Bui's Fourth Amendment right to be free from excessive force.[6] *See George,* 736 F.3d at 838–39 (affirming the district court's denial of the defendants' motion for summary judgment because it could not say the officers assuredly stayed within Constitutional bounds without knowing "[w]hat happened at the rear of [the plaintiff's] residence during the time [the plaintiff] walked out into the open on his patio and the fatal shot [was fired]"); *Espinosa v. City and County of San Francisco,* 598 F.3d 528, 532 (9th Cir.2010) ("In this case, the district court properly denied the summary judgment motion because there are genuine issues of fact regarding whether the officers violated [the decedent's]

---

6. Plaintiffs contend that they also bring a Fourth Amendment claim based on the Officers Ortiz's and Wilson's "provocation" of the confrontation that led to Bui being shot. *See* Opposition, ECF No. 27–31. As the Ninth Circuit has explained, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be liable for his otherwise defensive use of deadly force." *Billington v. Smith,* 292 F.3d 1177, 1189 (9th Cir.2002); *see Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1366 (9th Cir.1994). In that circumstance, however, the "basis for liability for the subsequent [defensive] use of force is the initial constitutional violation, which must be established under the Fourth Amendment's reasonableness standard." *Id.* at 1190. Plaintiffs argue in their opposition that Officers Ortiz and Wilson recklessly and intentionally provoked the confrontation because they subsequently testified that they would not have done anything differently had they known that Bui was mentally ill and that the officers' allegedly unlawful entry into the house and pointing of their guns at the allegedly non-threatening Bui constitute independent Fourth Amendment violations. *See* Opposition, ECF No. 120 at 29–31. Defendants, in turn, argue in their reply that the officers did not commit independent Fourth Amendment violations and, nevertheless, Plaintiffs

cannot introduce this new theory of liability this late in the case. *See* Reply, ECF No. 110 at 13–20.

The court declines hold that Defendants are entitled to summary judgment with respect to a Fourth Amendment provocation theory. First, Defendants say that they would have conducted more detailed discovery regarding the alleged independent Fourth Amendment violations had it been clear that Plaintiffs brought a provocation theory claim, and the court is not convinced there has been sufficient briefing on the matter. Second, the concept of escalation is raised in the Complaint, *see* Complaint, ECF No. 1, ¶ 20, and the context of what happened is relevant to whether the officers acted reasonably. The case is charged as an excessive-force-resulting-in-wrongful-death case because that is what the harm is. That a stand-alone provocation theory claim is not explicitly alleged in the complaint does not preclude the court from considering the entire context of what happened (from entry to shooting) when determining whether the officers' subsequent conduct was reasonable. The court expressed this opinion at the June 26, 2014 hearing, and neither party took issue with it. Third, pleadings often are amended to conform to the proof, even at trial, and to the extent that there are disputes, they seem better addressed by motions in limine or jury instructions.

Fourth Amendment rights."). Indeed, as the Ninth Circuit explained when confronted with similar circumstances:

> Balancing these various considerations, we hold that the district court erred in granting summary judgment on the constitutionality of the officers' use of force. We recognize that the officers have offered evidence that could support a verdict in their favor. A jury could view the facts as the district court did, and likewise reach the conclusion that the officers' use of force was reasonable. But on summary judgment, the district court is not permitted to act as a factfinder. The circumstances of this case can be viewed in various ways, and a jury should have the opportunity to assess the reasonableness of the force used after hearing all the evidence. Because the disputed facts and inferences could support a verdict for either party, we are compelled to reverse the district court's entry of summary judgment.

*Glenn*, 673 F.3d at 878 (internal citation omitted); *see also Burns*, 737 F.Supp.2d at 1058–59 ("Because an excessive force claim 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,' the Ninth Circuit has also instructed that summary judgment in excessive force cases should be granted sparingly.") (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002)).

**B. The Officers Are Not Entitled to Qualified Immunity at This Time**

Defendants assert that even if Officers Ortiz and Wilson violated Bui's Fourth Amendment right by using excessive force, they are entitled to qualified immunity because as of 2010 case law was clear that officers may lawfully use deadly force when a suspect threatens and assaults the officer with a knife. *See* Motion, ECF No. 81 at 22–25.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting)).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Id.* at 232, 129 S.Ct. 808. "First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. "Second, if the plaintiff has satisfied this first step, the court must

decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 555 U.S. at 232, 129 S.Ct. 808. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).[7]

As to step one, as noted above, genuine issues of material fact exist regarding whether the officers used objectively reasonable force in shooting Bui.

 As to step two, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151; *see also Walker v. Gomez,* 370 F.3d 969, 978 (9th Cir.2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

Defendants argue that as of 2010, the year the officers shot Bui, "it was well-established that 'where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.'" Motion, ECF No. 81 at 22–23

(quoting *Billington v. Smith,* 292 F.3d 1177, 1181 (9th Cir.2002) and citing *Gregory v. County of Maui,* 523 F.3d 1103, 1108 (9th Cir.2008); *Long v. City and County of Honolulu,* 511 F.3d 901, 906 (9th Cir.2007); *Blanford,* 406 F.3d at 1117–18; *Reynolds,* 84 F.3d at 1168). They also argue that as of 2010 it was well-established that "deadly force is proper when a mentally disturbed suspect threatens and assaults officers with a knife." *Id.* at 23 (citing *Reynolds,* 84 F.3d at 1168). But as described above, under Plaintiffs' version of the facts, Bui did not attack or threaten Officers Ortiz or Wilson or anyone else in the house after he left the bathroom and before the officers shot him. Again, according to Plaintiffs' evidence, while Bui did have the X–Acto knife in his hand, it was always down at his side, and rather than charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall because the officers told him to come out of the bathroom. They also present evidence that suggests Bui was not directly facing the officers in the erect position and was turned away to his right from Officer Ortiz when he was shot.

 Officers Ortiz and Wilson shot Bui in 2010, and by that time "[c]ase law ha[d] clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres,* 610 F.3d 546, 550 (9th Cir. 2010); *see Curnow,* 952 F.2d at 325 (affirming the district court's denial of qualified immunity for officers where, under the plaintiff's version of the 1986 shooting, the

---

**7.** The Supreme Court has stated that the order in which these questions are addressed is left to the lower court's discretion. *Pearson,* 555 U.S. at 236, 129 S.Ct. 808 ("[W]hile the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted

to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). That said, the Supreme Court also believes that the order used in *Saucier* "is often beneficial." *Id.*

officers could not reasonably have believed the use of deadly force was lawful because the decedent did not point the gun at the officers and apparently was not facing them when they shot him the first time). It is not enough to simply say, as Defendants do in arguing for qualified immunity, that Bui posed an immediate threat to the officer or others because he previously harmed Sharon H., "advanced" toward the officers while holding a knife, and did not drop it: how Bui moved and the speed at which he moved as he "advanced" toward the officers matters, and the court does not believe that, under Plaintiffs' version of the facts, Bui's slow, cringed, defensive shuffling while holding an X–Acto knife at his side constituted an immediate threat to the officers or others. The court does not believe that the case law cited by Defendants supports such a finding. And if Bui did not present an immediate threat to the officers or others, they were not allowed to use deadly force to apprehend him, and qualified immunity does not apply to their actions. *See Wilkinson,* 610 F.3d at 550; *Curnow,* 952 F.2d at 325.

This is not to say that the officers may not be entitled to qualified immunity after the disputed material facts are resolved. But for now, the court denies Defendants' motion insofar as it asks the court conclude that the officers are entitled to qualified immunity. *See Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir.2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *Santos,* 287 F.3d at 855 n. 12 (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted);

*McCloskey v. Courtnier,* No. C 05–4641 MMC, 2012 WL 646219, at *3 (N.D.Cal. Feb. 28, 2012); *Burns,* 2010 WL 3340552, at *12, 737 F.Supp.2d 1047 ("Just as the question of whether a constitutional violation occurred here turns entirely on whose facts to accept, so too does the question of immunity. More simply, if [plaintiff] behaved as the officers contend, their mistake of fact might be objectively reasonable. If he did not, the mistake may be deemed unreasonable."); *Herrera v. Las Vegas Metro. Police Dept.,* 298 F.Supp.2d 1043, 1051 (D.Nev.2004) ("[I]t would be premature to determine the officials' qualified immunity status at this time [after having concluded that a reasonable jury could find that the action complained of constituted a violation of the decedent's Constitutional rights], because whether the officers may be said to have acted reasonably will depend on the jury's resolution of the disputed facts.") (citation omitted).

## III. PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM

Plaintiffs' second claim is that Defendants' use of force unconstitutionally interfered with their rights to familial relationships in violation of the Fourteenth Amendment. Defendants argue that their claim fails because Officers Ortiz's and Wilson's conduct did not "shock the conscience" and are protected by qualified immunity. As explained below, the court disagrees because genuine issues of material fact prevent the court from deciding whether a Fourteenth Amendment violation occurred or whether the officers are protected by qualified immunity

### A. Genuine Issues of Material Fact Prevent the Court from Deciding Whether a Fourteenth Amendment Violation Occurred

The Fourteenth Amendment's substantive due process clause protects

against the arbitrary or oppressive exercise of government power. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043, 84546 (1998). Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Lemire v. Cal. Dept. of Corrections & Rehabilitation,* 726 F.3d 1062, 1075 (9th Cir.2013) (parents and children); *Smith v. City of Fontana,* 818 F.2d at 1418–19; *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991) (parent); *Crumpton v. Gates,* 947 F.2d 1418, 1421–24 (9th Cir.1991) (child); *cf. Ward v. City of San Jose,* 967 F.2d 280, 284 (9th Cir.1992) (sibling has no constitutionally protected interest in brother's companionship under section 1983).

▆▆▆▆ "[T]he Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis,* 523 U.S. at 845–47, 118 S.Ct. 1708; *see Lemire,* 726 F.3d at 1075. The cognizable

level of executive abuse of power is that which "shocks the conscience" or "violates the decencies of civilized conduct." *Id.* at 846, 118 S.Ct. 1708. Mere negligence or liability grounded in tort does not meet the standard for a substantive due process decision. *Id.* at 849, 118 S.Ct. 1708.

▆▆▆▆ "In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir.2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. County of San Diego,* 736 F.3d 1223, 1230 (9th Cir.2013) (citing *Wilkinson,* 610 F.3d at 554).[8]

8. In their motion, Defendants appear to assume that the "purpose to harm" standard applies and contend that a plaintiff must present evidence that the officer acted with "malice" to prevail on a 14th Amendment due process claim. *See* Motion, ECF No. 81 at 26–27. Defendants then argue that Plaintiffs here have not done so. *Id.* Defendants disagree that "malice" is included in the "purpose to harm" standard. Opposition, ECF No. 120 at 31–32. While it true that the Supreme Court stated in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), that the standard for claims under the Eighth Amendment turns on "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm,'" *id.* at 320–21, 106 S.Ct. 1078 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)), and while it also is true that in

*Lewis* the Supreme Court analogized to the prison riot context at issue in *Whitley* when it held that the "purpose to harm" standard applied to judge an officer's decisions while in a high-speed pursuit of a suspect on a motorcycle, *see* 523 U.S. at 852–53, 118 S.Ct. 1708, the Supreme Court nevertheless omitted any "malicious" and "sadistic" language when it explicitly held that "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience" that is necessary for a due process violation in the context of a high-speed automobile chase, *id.* at 836, 118 S.Ct. 1708. Subsequent Ninth Circuit opinions also have failed to include any "malicious" and "sadistic" language when stating the "purpose to harm" standard. *See Porter,* 546 F.3d at 1137, 1140 (citing *Lewis,* 523 U.S. at 836, 118 S.Ct. 1708); *see also Wilkinson,* 610 F.3d at 554 (citing *Porter,*

A court may determine at summary judgment whether the officer had time to deliberate (such that the deliberate indifference standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the purpose to harm standard applies), "so long as the undisputed facts point to one standard or the other." *Duenez v. City of Manteca*, No. CIV. S-11-1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D.Cal. Dec. 23, 2013). But, "[b]y its nature, the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *Id.*

In their motion, although they never make it explicit, Defendants argue that the purpose to harm standard applies because Officers Ortiz and Wilson did not have time to deliberate before having to shoot Bui because the situation in the house was quickly escalating and he attacked or threatened them with the knife. *See* Motion, ECF No. 81 at 26–27. Assuming that this standard applies, Defendants then argue that they are entitled to summary judgment because Plaintiffs do not (and cannot) point to admissible evidence showing that Officers Ortiz or Wilson acted with a purpose to harm Bui. Rather, the officers acted in furtherance of a legitimate law enforcement objective, and they were forced to shoot Bui "in response to the life-threatening circumstances they faced." Motion, ECF No. 81 at 27.

Even though the officers were not in the house for very long—it is undisputed that between 45 and 90 seconds elapsed between the time the officers entered the house and the time shots were fired, and approximately 10 to 15 seconds elapsed from the time the officers first had contact with Bui at the bathroom door to when the shots were fired—Plaintiffs argue that it is not clear whether Officers Ortiz and Wilson in fact were in a quickly escalating situation that required them to make the snap judgment to shoot Bui because, as the court described above, there is evidence showing that while Bui did have the X–Acto knife in his hand, it was always down at his side, and rather than charging at the officers, he assumed a defensive, cringing posture and shuffled slowly down the hall because the officers told him to come out of the bathroom. They also present evidence that suggests Bui was not directly facing the officers when he was shot. Viewing the evidence in favor of Plaintiffs, it is possible that the deliberate indifference, and not the purpose to harm, standard would apply here. *See Duenez*, 2013 WL 6816375, at *15 ("Even if it found that decedent had a knife in his hand, that alone would not necessarily bring the situation into a 'purpose to harm' situation, since a reasonable jury could find that decedent was not advancing on [the officer], nor threatening him with the knife."). Plaintiffs go on to point out that courts have denied summary judgment when it was unclear, because of the disputed facts, which standard applied. *See id.* (finding that there was "a genuine dispute about whether [the officer] had the 'luxury' of

546 F.3d at 1140). Following the Supreme Court's explicit holding in Lewis and the subsequent Ninth Circuit opinions, the court finds that Plaintiffs need not present evidence that Officers Ortiz and Wilson acted with "malice" to prevail on their 14th Amendment due process claim. *See Rodriguez v. City of Fresno*, 819 F.Supp.2d at 937, 948 (E.D.Cal.

2011) ("In this circuit, the phrase 'maliciously and sadistically for the very purpose of causing harm' is often restated as requiring that the plaintiff show that the officer 'acted with a purpose to harm [the plaintiff] for reasons unrelated to legitimate law enforcement objectives.' ") (quoting *Porter*, 546 F.3d at 1137)).

deliberation" and denying summary judgment in favor of the defendants on the plaintiffs' Fourteenth Amendment due process claim because "a reasonable jury could find [that the officer] acted with deliberate indifference in a non-emergency situation, or that he acted with a purpose to harm decedent"); *McCloskey,* 2012 WL 646219, at *4 (denying summary judgment in favor of the officer on the plaintiffs' Fourteenth Amendment due process claim because "the facts relevant to a determination of whether [the officer] had time to fully consider his use of pepper spray and/or whether he acted with 'deliberate indifference'" are disputed); *F.C. ex rel. Rios v. County of Los Angeles,* No. CV 10–169 CAS (Rzx), 2010 WL 5157339, at *5–6 (C.D.Cal. Dec. 13, 2010) (denying summary judgment in favor of the defendants on the plaintiffs' Fourteenth Amendment due process claim where the facts regarding how the shooting occurred were disputed).

The court notes that Defendants failed to respond in their reply to any of Plaintiffs' arguments about the Fourteenth Amendment claim. *See generally* Reply, ECF No. 110. Based on the record and the authorities cited, the court denies Defendants' motion insofar as it asks the court conclude that the officers did not violate Plaintiffs' Fourteenth Amendment due process right to be free from interference with their rights to familial relationships.

### B. The Court Cannot Say at this Time that the Officers are Entitled to Qualified Immunity

Defendants assert that even if Officers Ortiz and Wilson violated Plaintiffs' Fourteenth Amendment rights by using excessive force that shocks the conscience, they are entitled to qualified immunity. But just as their qualified immunity argument fails with respect to Plaintiffs' Fourth

Amendment claim, their arguments fails with respect to Plaintiffs' Fourteenth Amendment claim, too. This is because, based on the evidence presented by both sides, it is unclear what the situation was, and thus the court cannot decide as a matter of law whether it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. In these circumstances, the court denies Defendants' motion insofar as it asks the court conclude that the officers are entitled to qualified immunity.

## IV. PLAINTIFFS' *MONELL* CLAIM

Plaintiffs' third claim is against CCSF for its failure to train the officers. In their opposition, Plaintiffs state that they do not oppose Defendants' motion for summary judgment with respect to Plaintiffs' third claim. Opposition, ECF No. 120 at 9 n.1. Accordingly, the court grants Defendants' motion with respect to Plaintiffs' third claim.

## V. PLAINTIFFS' WRONGFUL DEATH CLAIM

Plaintiffs' fourth claim is against CCSF (under a theory of respondeat superior) for wrongful death, *see* Cal. Civ.Proc.Code § 377.60, which is simply the statutorily-created right of an heir to recover damages resulting from a tortious act which results in the decedent's death," *Gilmore v. Superior Court,* 230 Cal.App.3d 416, 420, 281 Cal.Rptr. 343 (1991) (citations omitted). "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256, 1264, 45 Cal.Rptr.3d 222 (2006). The California Supreme Court has held that "an officer's lack of due care can

give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin,* 24 Cal.3d 629, 634, 156 Cal.Rptr. 727, 596 P.2d 1143 (1979) (citing *Grudt v. City of Los Angeles,* 2 Cal.3d 575, 587, 86 Cal.Rptr. 465, 468 P.2d 825 (1970)). In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler,* 171 Cal.App.4th 516, 526 n.10, 89 Cal.Rptr.3d 801 (2009). Moreover, where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly "included in the totality of circumstances surrounding [his] use of deadly force." *Hayes v. County of San Diego* ("*Hayes I*"), 57 Cal.4th 622, 632, 160 Cal. Rptr.3d 684, 305 P.3d 252 (2013).

Defendants argue that CCSF is not liable because the officers are protected by several statutory privileges and thus are immune from liability. *See Gilmore,* 230 Cal.App.3d at 421, 281 Cal.Rptr. 343 ("A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent.") (citations omitted).

First, they argue that they are protected under California Penal Code § 835a, which provides that

[a]ny peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance." It goes on to provide in pertinent part that "[a] peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested.

■ As to Officers Ortiz's and Wilson's shooting of Bui, Defendants argue that the "reasonableness" standard for a wrongful death claim is the same as the standard for a Fourth Amendment excessive force claim and that Plaintiffs' wrongful death claim fails because Plaintiffs' Fourth Amendment excessive force claim fails. But as explained above, there are genuine issues of material fact that prevent the court from ruling that the officers' conduct did not violate the Fourth Amendment, and this means that the court also cannot rule that the officers were not liable for wrongful death. Defendants' reliance on *Hernandez v. City of Pomona* does not change this outcome because in that case the officers' conduct was determined to be reasonable under the Fourth Amendment. *See* 46 Cal.4th 501, 512, 516, 94 Cal.Rptr.3d 1, 207 P.3d 506 (2009) (plaintiffs were collaterally estopped from bringing a wrongful death claim based on the officers' use of deadly force because a federal court previously ruled that the officers' conduct (shooting the decedent) was reasonable under the Fourth Amendment). Here, there has been no such ruling, and the court will not make such a ruling on summary judgment.

As to Officers Ortiz's and Wilson's preshooting conduct, Defendant argue that the officers were entitled to persist in arresting Bui, in the face of his resistance. They again cite *Hernandez,* which rejected the plaintiffs' "preshooting negligence claim" because the officers had probable cause to arrest the decedent and, under Section 835a, could use reasonable force to arrest him and did not have an obligation to stop trying to do so. *See id.* at 518–21, 94 Cal.Rptr.3d 1, 207 P.3d 506. But in that case, the court's decision was made "in light of the [federal court's previous] finding that the shooting was reasonable," so the court focused only on the officers' pre-shooting pursuit of the dece-

dent. *See id.* Here, on the other hand, Plaintiffs' wrongful death claim is not limited only to the officers' preshooting conduct; instead, it is based on the totality of the circumstances surrounding his death, and it is still undecided whether the officers' shooting of Bui was reasonable. Thus, the officers' preshooting conduct should not be considered separately from their shooting of Bui. *See Hayes I,* 57 Cal.4th at 632, 160 Cal.Rptr.3d 684, 305 P.3d 252 (where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly "included in the totality of circumstances surrounding [his] use of deadly force"). Accordingly, the court cannot find that the officers are protected under Section 853a in these circumstances.

▆▆▆ Second, Defendants argue that they are protected under California Penal Code § 196. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty." *Brown,* 171 Cal. App.4th at 533, 89 Cal.Rptr.3d 801 (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation marks omitted) (alteration in original). The obvious problem with this argument is that the court cannot say at this stage whether Officers Ortiz's and Wilson's actions were reasonable because there are genuine issues of material fact regarding what happened, and under Plaintiffs' version of the facts, a reasonable jury could conclude that the officers' ac-

tions were not reasonable. Plaintiffs cite several opinions where courts have rejected Section 196 immunity arguments in this situation, *see Mitchell v. City of Pittsburg,* No. C 09–00794 SI, 2013 WL 5487816, at *12 (N.D.Cal. Oct. 1, 2013) (rejecting on summary judgment the defendants' Section 196 immunity argument where a reasonable jury could find that the officer used excessive force in shooting the decedent); *McMurray v. County of Sacramento,* No. CIV S–092245 GEB, 2011 WL 4709876, at *28 (Oct. 4, 2011) (rejecting on summary judgment the defendants' Section 196 immunity argument because "there are genuine issue[s] of material fact regarding whether [the officer's] use of deadly force was reasonable, and whether the circumstances surrounding the incident reasonably created a fear in [the officer] of great bodily injury or death to himself or others"); *Adams v. Speers,* No. CV–F–02–5741 LJO, 2004 WL 5567292, at *15 (Dec. 16, 2004) (rejecting on summary judgment the defendants' Section 196 immunity argument where the plaintiffs "raised factual issues [about] whether [the officer] was in danger when he fired six shots," "whether [the officer] acted reasonably," and "whether the circumstances generated a reasonable fear of danger to [the officer] or others"; "Since this Court is not prepared to rule that [the officer's] conduct does not shock the conscience, this Court is not prepared to rule he justifiably killed [the decedent] under California Penal Code sections or was otherwise immune."); *cf. Martinez,* 47 Cal.App.4th at 349–50, 54 Cal.Rptr.2d 772 (because the court concluded that the officers acted reasonably under a 42 U.S.C. § 1983 excessive force claim analysis, the court also concluded that the plaintiffs' wrongful death claims were barred under Section 196), and Defendants failed to address any of them in their reply, *see generally* Reply, ECF No. 110. This court likewise declines to find

that the officers are protected under Section 196 in these circumstances.

 Third, Defendants argue that they are protected by California Government Code § 821.6, which provides that "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." As the Ninth Circuit has explained, "[t]he provision's principal function is to provide relief from malicious prosecution," *Blankenhorn v. City of Orange*, 485 F.3d 463, 487–88 (9th Cir. 2007) (citing *Kayfetz v. California*, 156 Cal.App.3d 491, 497, 203 Cal.Rptr. 33 (1984)), but it "also 'extends to actions taken in preparation for formal proceedings,' including actions 'incidental to the investigation of crimes,'" *id.* at 488 (citing *Amylou R. v. County of Riverside*, 28 Cal. App.4th 1205, 1209–11, 34 Cal.Rptr.2d 319 (1994)). "Even so, section 821.6, as it applies to police conduct, is limited to actions taken in the course or as a consequence of an investigation." *Id.* With this in mind, Plaintiffs point out that the problem with Defendants' argument is that the officers' shooting of Bui is "not the sort of conduct to which section 821.6 immunity has been held to apply." *See id.* (citing *Crowe v. County of San Diego*, 303 F.Supp.2d 1050, 1120 (S.D.Cal.2004), *rev'd in part on other grounds*, 608 F.3d 406 (9th Cir.2010) (applying Section 821.6 immunity to officers who conducted interrogations and strip searches during the course of a murder investigation); *Baughman v. California*, 38 Cal.App.4th 182, 191–93, 45 Cal.Rptr.2d 82 (1995) (applying Section 821.6 immunity to officers who destroyed computer floppy disks during a search related to an investigation of computer equipment theft); *Amylou R.*, 28 Cal.App.4th at 1210–11, 34 Cal.Rptr.2d 319 (applying Section 821.6 immunity to officers who took a rape and attempted murder victim against her will to the crime scene and later told neighbors that she was lying about what happened)). Rather, in this case, "the alleged tortious conduct occurred during an arrest, not an investigation." *See id.* (rejecting the defendants' Section 821.6 argument because the plaintiff's assault and battery, negligence, and intentional infliction of emotional distress claims are based on acts that allegedly happened during his arrest, not pursuant to an investigation into his guilt); *Tien Van Nguyen v. City of Union City*, No. C–13–01753–DMR, 2013 WL 3014136, at *7 (N.D. Cal. June 17, 2013) (rejecting the defendants' Section 821.6 argument because the plaintiffs' intentional infliction of emotional distress claim was based on the defendant officers' use of excessive force against him during his arrest); *Medora v. City and County of San Francisco*, No. C 06–0558 EDL, 2007 WL 2522319, at *10 (N.D.Cal. Aug. 31, 2007) (rejecting the defendants' Section 821.6 argument because "there is no evidence that the officers at the scene of the excessive force incident were engaged in the investigation of a crime for purposes of immunity under this section"). Defendants' attempt to distinguish *Blankenhorn* on the ground that the officers' "decision to seek out and confront Bui immediately, without resorting to other tactics," was "investigative in nature," Motion, ECF No. 81 at 35 n.14, is not persuasive in light of the authorities cited by Plaintiffs (and which were not addressed by Defendants in their reply, *see generally* Reply, ECF No. 110). Accordingly, the court finds that Section 821.6 immunity does not protect Officers Ortiz and Wilson from liability for Plaintiffs' wrongful death claim.

In sum, the court finds that it cannot yet determine whether the officers are protected by California Penal Code §§ 835a or 196 and that California Government

Code § 821.6 does not apply here. Accordingly, the court denies Defendants' motion insofar as it asks the court conclude that they are entitled to summary judgment on Plaintiffs' fourth claim.

## CONCLUSION

Based on the foregoing, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. The court **DENIES** the motion with respect to Plaintiffs' first claim for a violation of the Fourth Amendment, Plaintiffs' second claim for a violation of the Fourteenth Amendment, and Plaintiffs' fourth claim for wrongful death. The court **GRANTS** the motion with respect to Plaintiffs' third claim under *Monell*.

**IT IS SO ORDERED.**